Sandra D. **BULLARD**

v.

**DALKON SHIELD CLAIMANTS TRUST.**

Civ. No. B–92–882.

United States District Court, D. Maryland.

Feb. 16, 1994.

R. James Lore, Lore & McClearen, Raleigh, NC, and Brandon J. Levine, Law Offices of Aaron M. Levine, Washington, DC, for plaintiff.

Richard M. Barnes and Kevin Pascale, Goodell, DeVries, Leech & Gray, Baltimore, MD, for defendant.

. WALTER E. BLACK, Jr., Chief Judge.

Presently pending before the Court in the above-captioned case is a Motion for Summary Judgment filed on behalf of defendant Dalkon Shield Claimants Trust. Plaintiff Sandra D. Bullard originally filed suit in the Circuit Court of Maryland for Prince George's County on May 2, 1985, against Hugh J. Davis, Jr., Frederick A. Clark, Jr., and A.H. Robins Company, Inc. ("A.H. Robins"), seeking recovery for injuries allegedly caused by the Dalkon Shield, an intrauterine device manufactured by A.H. Robins. The suit was automatically stayed pursuant to 11 U.S.C. § 362(a) upon the filing of A.H. Robins' Chapter 11 petition in the United States District Court for the Eastern District of Virginia, Richmond Division, on August 21, 1985. On March 3, 1992, that court entered an order permitting Bullard to recommence this suit, with Dalkon Shield Claimants Trust substituted as defendant. The suit was removed to this Court on March 27, 1992, pursuant to 28 U.S.C. § 1441(a).

Defendant now moves for summary judgment on the ground that Bullard's suit is barred by a North Carolina statute of repose. Bullard contends that the statute of repose is not applicable because of an exception recognized by the Supreme Court of North Carolina. Instead, Bullard asserts that Maryland's period of limitations controls this case and that she timely filed within the period allowed by Maryland's statute of limitations. Defendant, however, contends that the exception recognized by the Supreme Court of North Carolina is a narrow one and would not be extended by that court to a plaintiff in Bullard's circumstances.

The issues raised by the motion have been fully briefed and the Court has had the benefit of oral argument at a hearing held on May 28, 1993.

I

On January 11, 1972, Bullard was seen by Dr. John H. Chapin in Sanford, North Carolina, for the insertion of an intrauterine

device. Although medical records do not indicate the type of IUD inserted, Bullard believes the device to have been a Dalkon Shield because of its "peculiar crab-like shape." On April 25, 1974, Bullard was admitted to Lee County Hospital in Sanford by Dr. John C. Foushee due to a "retained intrauterine device." The IUD was removed by Dr. Foushee intact.

On August 29, 1977, Bullard was admitted to Moore Memorial Hospital in Pinehurst, North Carolina, by Dr. Jerry Smith for a right salpingectomy in order to treat what had been diagnosed as an ectopic pregnancy. During the surgery Dr. Smith apparently found evidence of "old chronic pelvic inflammatory disease." Bullard claims that she was never informed by Dr. Smith of this condition.

Bullard contends that she first learned of a possible causal connection between her gynecological injuries and her use of the Dalkon Shield after reading an advertisement in a Raleigh, North Carolina, newspaper in November–December, 1984. Bullard further contends that none of her previous physicians informed her that her gynecological problems could be linked to her use of an IUD.

## II

■ Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment can only be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–84, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, summary judgment is not appropriate unless, viewing the possible inferences in a light most favorable to the non-moving party, *no reasonable jury could return a verdict in its favor.* *Helm v. Western Maryland*

*Railway Co.,* 838 F.2d 729, 734 (4th Cir. 1988); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The Court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512.

In the present case, defendant's motion is based not upon the merits of Bullard's claims, but rather upon the operation of a North Carolina statute of repose, which it contends is the law applicable to this case.

## III

■ A federal court sitting in diversity must look to the conflict of law rules of the forum state to determine the substantive law applicable to the case. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The forum state here—Maryland—still adheres to the rule of *lex loci delicti* for tort actions and applies the law of the state where the wrong occurs. *Hauch v. Connor,* 295 Md. 120, 123, 453 A.2d 1207, 1209 (1983). It is undisputed that the IUD at issue in this case was inserted in North Carolina and that all injuries claimed by Bullard occurred in North Carolina. Accordingly, under the rule of *lex loci delicti,* the substantive law of North Carolina applies to this case.

## IV

■ Defendant contends that a North Carolina statute of repose compels judgment in its favor as a matter of law. North Carolina General Statute § 1–50(6) provides:

No action for the recovery of damages for personal injury, death or damage to property based upon or arising out of any alleged defect or any failure in relation to a product shall be brought more than six years after the date of initial purchase for use or consumption.

N.C.Gen.Stat. § 1–50(6) (1992). This Court has previously ruled that a Maryland court would find a statute of repose to be substantive law, not procedural law. *Pottratz v. Davis,* 588 F.Supp. 949, 953 (D.Md.1984)

(construing an Oregon statute of repose). This Court has also found that a Maryland court construing the law of another state would find it instructive to consider the decisions of that state on the particular issue in question. *Id.* In this case, the Supreme Court of North Carolina has ruled that N.C.G.S. § 1–50(6) is a statute of repose and is therefore a substantive, rather than a procedural, limitation on personal injury actions. *Bolick v. American Barmag Corp.*, 306 N.C. 364, 293 S.E.2d 415, 419 (1982). Accordingly, this Court finds that N.C.G.S. § 1–50(6), insofar as it constitutes a statute of repose, is substantive and not procedural law.

█ The Court observes that N.C.G.S. § 1–50(6) became effective on October 1, 1979, and, at first glance, raises questions of retroactivity if applied in this case. In this regard, the Supreme Court of North Carolina has held that N.C.G.S. § 1–50(6) does not apply to claims accruing prior to October 1, 1979. *See Bolick,* 293 S.E.2d at 420; *Bernick v. Jurden,* 306 N.C. 435, 293 S.E.2d 405, 413 (1982). In order to determine accrual for purposes of N.C.G.S. § 1–50(6), the *Bolick* and *Bernick* courts referred to the applicable statute of limitations for the statutory definition of accrual. *Id.* Following this procedure, the Court determines that two statutes defined accrual for personal injury actions during the period at issue in the present case. Until October 1, 1979, N.C.G.S. § 1–15(b) provided:

> Except where otherwise provided by statute, a cause of action, ... having as an essential element bodily injury to the person or a defect in or damage to property which originated under circumstances making the injury, defect or damage not readily apparent to the claimant at the

time of its origin, is *deemed to have accrued at the time the injury was discovered by the claimant, or ought to have been discovered by him,* whichever event first occurs; provided that in such cases the period shall not exceed ten years from the last act of the defendant giving rise to the claim for relief.

N.C.Gen.Stat. § 1–15(b) (1971) (repealed effective October 1, 1979) (emphasis added). After October 1, 1979, N.C.G.S. § 1–52(16) provided a similar definition of accrual for personal injury actions.[1] *See* N.C.Gen.Stat. § 1–52(16) (1992). Both statutes define accrual as the time of a claimant's discovery of her injury. In the present case, Bullard claims she did not discover her cause of action until 1984 and makes no claim that her claim ought to have been discovered prior to October 1, 1979. Thus, under the rule established by the Supreme Court of North Carolina in *Bolick* and *Bernick,* Bullard's cause of action would not be deemed to have accrued as of October 1, 1979, for purposes of the applicability of N.C.G.S. § 1–50(6). Accordingly, this Court finds that a North Carolina court would find N.C.G.S. § 1–50(6) applicable because Bullard's cause of action would be deemed not to have accrued as of October 1, 1979.

### V

Bullard contends that N.C.G.S. § 1–50(6) is not a applicable to the present case because of an exception to statutes of repose recognized by the Supreme Court of North Carolina in *Wilder v. Amatex Corp.*, 314 N.C. 550, 336 S.E.2d 66, 69 (1985).[2] In *Wilder,* the Supreme Court of North Carolina held that the ten-year period of repose contained

---

1. N.C.G.S. § 1–52(16) provides in pertinent part:
   Unless otherwise provided by statute, for personal injury ... the cause of action ... shall not accrue until bodily harm to the claimant ... becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs. Provided that no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action. N.C.Gen.Stat. § 1–52(16) (1992).

2. In her papers, Bullard has addressed her argument to both N.C.G.S. § 1–50(6) and N.C.G.S.

§ 1–15(b). North Carolina courts have clearly construed N.C.G.S. § 1–15(b) as containing a ten-year statute of repose. *See Leonard v. Johns–Manville Sales Corp.*, 316 N.C. 84, 340 S.E.2d 338, 339 (1986); *Wilder v. Amatex Corp.*, 314 N.C. 550, 336 S.E.2d 66, 69 (1985). Defendant, however, has not contended either in its papers or during oral argument at the hearing that the ten-year statute of repose contained in N.C.G.S. § 1–15(b) is applicable to this case. Accordingly, the Court will not consider whether N.C.G.S. § 1–15(b) would bar Bullard's action in this case.

in N.C.G.S. § 1–15(b) was not applicable to an asbestosis claim. *Id.,* 336 S.E.2d at 73. In so holding, the court first determined that the North Carolina legislature's purpose in enacting N.C.G.S. § 1–15(b) was to change the accrual period for latent injury claims. *Id.,* 336 S.E.2d at 69. The *Wilder* court then considered whether occupational diseases were latent injury claims for the purposes of N.C.G.S. § 1–15(b):

> None of the cases toward which [N.C.G.S. § 1–15(b) ] was directed involved disease. They all involved situations in which it was possible to identify a single point in time when plaintiff was first injured.
>
> A disease presents an intrinsically different kind of claim. Diseases such as asbestosis, silicosis, and chronic obstructive lung disease normally develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents. It is impossible to identify any particular exposure as the "first injury." Indeed, one or even multiple exposures to an offending substance in these kinds of diseases may not constitute injury. The first *identifiable* injury occurs when the disease is diagnosed as such, and at that time it is no longer latent.

*Id.,* 336 S.E.2d at 70 (emphasis in original). The court amplified this point by referring to cases which demonstrated that diseases like asbestosis, silicosis and chronic obstructive lung disease do not manifest until 10 to as much as 34 years after exposure. *Id.,* 336 S.E.2d at 70–71.

Observing that such occupational diseases present problems "from the standpoint of identifying legally relevant time periods," *id.,* 336 S.E.2d at 71, the *Wilder* court undertook to determine whether the North Carolina legislature intended for N.C.G.S. § 1–15(b) to apply to claims arising out of such diseases. After examination of North Carolina's worker's compensation statutes, the court found that, in that context, both the legislature and the courts had always treated the manifestation or diagnosis of an occupational disease as the date of injury. *Id.,* 336 S.E.2d at 72. Thus, the court concluded that

it was unlikely that the legislature would have treated occupational diseases as latent injury claims within the meaning of N.C.G.S. § 1–15(b) and accordingly concluded that the legislature did not intend for the section to apply to such claims. *Id.*

The *Wilder* court bolstered its conclusion through its analysis of additional legislative history pertaining to the statute of repose. The court reviewed earlier drafts of N.C.G.S. § 1–15(b) and found that these drafts initially contained references to disease. However, the court found that N.C.G.S. § 1–15(b) as enacted omitted those references. Accordingly, the court concluded that the legislature's deliberate omission of references to disease demonstrated its intent that N.C.G.S. § 1–15(b) have no applicability to claims arising from disease. *Id.,* 336 S.E.2d at 73.

The key issue in the present case is the breadth of the holding in *Wilder.* Bullard contends that the *Wilder* court held broadly that the statute of repose was not applicable to any cause of action based upon a "disease process." Consequently, Bullard contends that N.C.G.S. § 1–50(6) is not applicable to her suit, which is founded on injuries arising out of pelvic inflammatory disease allegedly caused by her use of a Dalkon Shield.

Defendant takes a much narrower view of *Wilder.* Defendant contends that the *Wilder* court merely recognized a narrow exception to statutes of repose for occupational diseases such as asbestosis, silicosis and chronic obstructive lung disease. This exception, defendant contends, does not extend to any of the injuries claimed by Bullard. Further, defendant contends that a North Carolina court would not extend this exception if requested.

At the outset, the Court finds the *Wilder* opinion somewhat ambiguous on this issue. Facially, certain language in the opinion could be read to support either interpretation of *Wilder.* While many portions of the opinion refer simply to claims arising from "disease," other portions specifically address "occupational diseases" or asbestosis, silicosis and chronic obstructive lung disease in particular. Subsequent North Carolina decisions, unfortunately, do not clearly resolve how the Supreme Court of North Carolina

views *Wilder*. In *Leonard v. Johns–Manville Sales Corp.*, 316 N.C. 84, 340 S.E.2d 338 (1986), an asbestosis case, the Supreme Court of North Carolina summarily referred to its decision in *Wilder* as holding that N.C.G.S. § 1–15(b) had no applicability to "claims arising out of disease." *Id.*, 340 S.E.2d at 340. However, in *Dunn v. Pacific Employers Ins. Co.*, 332 N.C. 129, 418 S.E.2d 645 (1992), the Supreme Court of North Carolina cited *Wilder* for the proposition that "[i]n occupational disease cases ... a cause of action grounded in negligence accrues when the disease is diagnosed." *Id.*, 418 S.E.2d at 647. In neither case, however, was the Supreme Court of North Carolina called upon to consider whether the *Wilder* exception encompassed a non-occupational disease or a disease having a shorter manifestation period than the periods associated with asbestosis, silicosis or chronic obstructive lung disease.

To some extent, the Fourth Circuit has considered the breadth of *Wilder*. In *Hyer v. Pittsburgh Corning Corp.*, 790 F.2d 30 (4th Cir.1986), the Fourth Circuit was the first court to hold that the *Wilder* exception was applicable to N.C.G.S. § 1–50(6). *Id.* at 34. Accordingly, the *Hyer* court reversed the district court's ruling that the plaintiff's asbestosis suit was barred by N.C.G.S. § 1–50(6). *Id.; see also Burnette v. Nicolet, Inc.*, 818 F.2d 1098, 1101 (4th Cir.1986). In *Guy v. E.I. DuPont de Nemours & Co.*, 792 F.2d 457, 460 (4th Cir.1986), the Fourth Circuit reached a similar result in a case arising out of chronic obstructive lung disease. The *Guy* court noted that chronic obstructive lung disease was specifically cited by the *Wilder* court as a disease to which the statute of repose does not apply. *Id.* However, in *Doe v. Doe*, 973 F.2d 237, 242 (4th Cir. 1992), the Fourth Circuit held that the *Wilder* exception does not apply to a claim of negligent infliction of emotional distress stemming from child abuse. The *Doe* court reasoned that a North Carolina court would not apply the *Wilder* exception to such a claim because there was no evidence that emotional distress claims were deliberately omitted by the North Carolina legislature in drafting the applicable statute of repose. *Id.*

In reaching this decision, the *Doe* court characterized *Wilder* as holding that the statute of repose "did not apply to occupational disease claims." *Id.* None of these cases are particularly helpful in resolving the issue before the Court, for the Court notes that the Fourth Circuit has neither extended the *Wilder* exception to a disease not specifically mentioned in *Wilder* nor rejected its extension to a non-occupational disease or a disease having a shorter manifestation period than the periods associated with asbestosis, silicosis or chronic obstructive lung disease.

At oral argument, Bullard relied heavily on the *Wilder* court's citation of *Booker v. Duke Medical Center*, 297 N.C. 458, 256 S.E.2d 189 (1979), in support of her contention that *Wilder* extends to a disease like pelvic inflammatory disease. The *Wilder* court cited *Booker* in the context of stressing the difficulty in assessing legally relevant time periods for occupational diseases:

> In *Booker v. Medical Center*, 297 N.C. 458, 483, 256 S.E.2d 189, 204 (1979), a hepatitis case, this Court recognized:
>
>> Most occupational diseases, however, are not the result of a single incident but rather of prolonged exposure to hazardous conditions or a disease-causing agent. *In such cases it is seldom possible to identify a specific isolated event to which the injury may be attributed.*
>
> Even with diseases which might be caused by a single harmful exposure such as, for example, hepatitis, it is ordinarily impossible to determine which of many possible exposures in fact caused the disease. *Id.*

*Wilder*, 336 S.E.2d at 71 (emphasis in original). From the foregoing, Bullard concludes that the *Wilder* court intended its ruling to encompass diseases like hepatitis, which can develop from a single exposure. Unlike hepatitis, Bullard asserts that pelvic inflammatory disease is a disease with a long manifestation period. In support, Bullard has submitted the affidavit of Dr. Robert Stillman for the opinion that chronic pelvic inflammatory disease can remain undetected for months or

years.[3] Thus, because pelvic inflammatory disease is a disease more like asbestosis, silicosis and chronic obstructive lung disease than hepatitis, Bullard asserts that pelvic inflammatory disease certainly would be within the realm of *Wilder*.

In *Booker*, the plaintiff was a laboratory worker who manually handled blood samples and was routinely exposed to blood infected with serum hepatitis. 256 S.E.2d at 199. The question before the *Booker* court was whether serum hepatitis was a compensable occupational disease[4] for purposes of a worker's compensation claim. *Id.* at 197. Although the *Booker* court found that serum hepatitis was a compensable occupational disease in that regard, it had no occasion to consider whether a claim arising from serum hepatitis would be excepted from a statute of repose. Likewise, the *Wilder* court did not positively state that serum hepatitis was one of the diseases to which N.C.G.S. § 1–15(b) had no applicability. Even if the Court accepts the proposition that the *Wilder* court intended for serum hepatitis to fall within its holding, that acceptance does not compel the conclusion that pelvic inflammatory disease would be treated similarly by a North Carolina court.

■ After careful consideration of *Wilder* and the cases following it, the Court finds that the exception to statutes of repose recognized by the Supreme Court of North Carolina in *Wilder* does not extend to the type of injury claimed by Bullard. The Court bases this conclusion on its understanding of the reasoning of the *Wilder* court. It is apparent that the *Wilder* court was concerned with diseases that "normally develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents." 293 S.E.2d at 70. The underlying theme evidenced throughout the opinion was the court's concern that occupational disease present extraordinary problems because of tremendous delays in manifestation. This point is brought home by the *Wilder* court's emphasis of cases demonstrating decade-long manifestation periods for diseases like asbestosis, silicosis and chronic obstructive lung disease. *Id.* at 70–71. Likewise, the *Wilder* court's analysis of worker's compensation law evidences its special focus on occupational diseases. All of these factors convince this Court that the Supreme Court of North Carolina intended the exception recognized in *Wilder* to apply solely to occupational diseases that share the attributes of long manifestation periods and difficulty in determining the time of exposure, despite any ambiguous language suggesting a broader scope.

Simply put, the Court finds that the injuries claimed by Bullard do not fall into the category of the occupational diseases recognized by the *Wilder* court. First, pelvic inflammatory disease is not an occupational disease. Even if it were, it is sufficiently dissimilar to asbestosis, silicosis or chronic obstructive lung disease as to bring it beyond the scope of *Wilder*. Even accepting the

3. As set forth in his affidavit, Dr. Stillman's opinion on the nature of pelvic inflammatory disease is as follows:

4. The mechanism by which the Dalkon Shield causes chronic pelvic inflammatory disease is through its defectively designed and constructed tail string. The tail string has an outer sheath which oftentimes will split or break, thus creating an unnatural path for bacteria to "wick" from the normally non-sterile vagina to the normally sterile uterus. Over time, the resistance of the body's immunological system can be overcome and infection may set in. This infection can be low grade and can remain undetected for long periods of time. Months or years may pass before the development of the overt symptoms that would require a woman to seek medical attention.

5. Because of the gradual and insidious nature of the disease process, it is impossible to pinpoint an exact time for injury resulting from pelvic inflammatory disease or the "wicking" of bacteria into the uterus. (Indeed, in some individuals so exposed to bacteria, the body's immune system will prevail and pelvic inflammatory disease will not develop.)

Plaintiff's Response (Paper 42), Exhibit 4, p. 2, at ¶¶ 4–5.

4. For an occupational disease to be compensable under the North Carolina worker's compensation law applicable in *Booker*, two conditions needed to be met: "(1) It must be 'proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment'; and (2) it cannot be an 'ordinary disease of life to which the general public is equally exposed outside of the employment.'" *Booker*, 256 S.E.2d at 196.

opinion of Dr. Stillman that chronic pelvic inflammatory disease can remain undetected for months or years, such a delay in manifestation does not approach the magnitude of delays attributed to the diseases specifically mentioned in *Wilder.* Moreover, there is no doubt as to the general time frame in which Bullard's exposure to the IUD occurred. Bullard's IUD was inserted on January 11, 1972, and removed on April 25, 1974. Her alleged injuries did not take several years to manifest themselves. Bullard claims that as a result of her use of the IUD, she suffered pelvic inflammatory disease, uncontrolled bleeding, embedment of the IUD, ectopic pregnancy, scarring, and infertility. None of these claimed injuries are delayed manifestation diseases in the sense referred to in *Wilder.* Bullard admits that the alleged embedment of the IUD was diagnosed in June, 1973, by Dr. Chapin and treated in April, 1974, by Dr. Foushee. Bullard's alleged pelvic inflammatory disease and uncontrolled bleeding were also diagnosed and treated by Dr. Foushee in 1974. Her alleged ectopic pregnancy, loss of organs, pelvic inflammatory disease, and scarring were diagnosed and treated in August, 1977, by Dr. Smith. Her alleged infertility was diagnosed as early as April, 1974. It is clear that all of Bullard's alleged injuries were diagnosed well within the statutory period for filing a claim under North Carolina law. Accordingly, the Court cannot find that the *Wilder* exception applies to this case or that a North Carolina court would extend it.

### VI

Thus, the Court finds that N.C.G.S. § 1–50(6) is applicable to the present case. When Bullard's IUD was inserted on January 11, 1972, she had six years, or until January 11, 1978, to bring an action relating to that product. Bullard did not file until May 2, 1985. Thus, Bullard failed to file her claim within the statutory period under North Carolina law. Accordingly, defendant is entitled to summary judgment as a matter of law.