J. W. WILDER v. AMATEX CORPORATION, THE CELOTEX CORPORATION, OWENS-CORNING FIBERGLAS CORPORATION, UNARCO INDUSTRIES, INC., FIBREBOARD CORPORATION, GAF CORPORATION, ARMSTRONG WORLD INDUSTRIES, INC., RAYBESTOS-MANHATTAN, INC., NICOLET INDUSTRIES, FORTY-EIGHT INSULATION, INC., EAGLE-PICHER INDUSTRIES, INC., KEENE CORPORATION, CAREY-CANADA, INC., JOHNS-MANVILLE SALES CORPORATION, STANDARD ASBESTOS INSULATION, INC., PITTSBURGH CORNING CORPORATION, H. K. PORTER, EMPIRE ACE INSULATION MANUFACTURING AND INSULATING COMPANY, TURNER-NEWALL, LTD., ROCK WOOL MANUFACTURING COMPANY, THE FLINTKOTE COMPANY, LAKE ASBESTOS OF QUEBEC, LTD., SOUTHERN TEXTILES CORPORATION, STARR-DAVIS, INC., STARR-DAVIS COMPANY, INC. OF SOUTH CAROLINA, NATIONAL GYPSUM COMPANY, A.C.&S., INC., U.S. MINERAL PRODUCTS COMPANY, NORTH BROTHERS, INC., JOHNS-MANVILLE AMIANTE CANADA, INC.

No. 239PA84

(Filed 5 November 1985)

1. **Sales § 22.2— asbestosis from exposure to defendant's products—summary judgment improperly granted**

In an action to recover damages for asbestosis allegedly caused by plaintiff's exposure to defendant's asbestos-containing products, summary judgment was improperly entered for defendant where the forecast of evidence at the summary judgment hearing did not demonstrate that plaintiff at trial will not be able to show that he was exposed to asbestos-containing insulation products manufactured, sold or distributed by defendant at various times during his working career as an insulation installer at construction sites.

2. **Limitation of Actions § 4.2; Negligence § 20; Sales § 22— civil asbestosis claim —statute of repose inapplicable**

The ten-year statute of repose set forth in former G.S. 1-15(b) (interim Supp. 1976, repealed 1979) does not apply to claims arising from disease and thus does not apply to plaintiff's civil action to recover damages for asbestosis allegedly caused by exposure to defendants' asbestos-containing products. Plaintiff's claim accrued on the date he was diagnosed as having the disease asbestosis, and under G.S. 1-52(16) he had three years from that date to bring suit.

Justice BILLINGS did not participate in the consideration or decision of this case.

Justice MEYER concurring in part and dissenting in part.

APPEAL by plaintiff from trial court orders granting several defendants' motions for summary judgment, entered at the 12 December 1983 Special Session of ORANGE County Superior

Court, *Judge E. Lynn Johnson* presiding. Defendants' petition to consider the appeal before its determination by the Court of Appeals allowed pursuant to N.C.G.S. § 7A-31.

*Haywood, Denny, Miller, Johnson, Sessoms & Haywood by Michael W. Patrick and George W. Miller, Jr., for plaintiff appellant.*

*Maupin, Taylor & Ellis, P.A., by Armistead J. Maupin, Richard M. Lewis and Mark S. Thomas for defendant appellee Eagle-Picher Industries, Inc.; Bell, Davis & Pitt, P.A., by Richard V. Bennett and William Kearns Davis for defendant appellee Pittsburgh Corning Corporation; Stith & Stith by F. Blackwell Stith for defendant appellee The Celotex Corporation; Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan by Thomas N. Barefoot and James Billings for defendant appellee Keene Corporation; Brown & Johnson by C. K. Brown, Jr. for defendant appellee Starr-Davis Company; Poisson, Barnhill & Britt by Donald E. Britt, Jr. and Stuart L. Egerton for defendant appellee Owens-Corning Fiberglass.*

*Taft, Taft & Haigler by Thomas F. Taft, Vickie Bletso and Kenneth E. Haigler for the amicus curiae, North Carolina White Lung Association.*

EXUM, Justice.

Plaintiff seeks damages for the disease asbestosis which he claims was caused by his exposure to products manufactured, sold or distributed by defendants.[1] Plaintiff alleges that he contracted the disease asbestosis through years of on-the-job contact with asbestos products manufactured, sold or distributed by the various defendants. Defendant appellees, after answering, moved for summary judgment, asserting in their motions that the "applicable statutes of limitations and/or repose" barred plaintiff's claim. The trial court granted their motions and entered summary

---

1. Only defendants Eagle-Picher Industries, Inc. ("Eagle-Picher"); Pittsburgh Corning Corporation ("Pittsburgh Corning"); The Celotex Corporation ("Celotex"); Keene Corporation ("Keene"); Starr-Davis Company ("Starr-Davis"); and Owens-Corning Fiberglass ("Owens-Corning") remain parties to this appeal. Fibreboard Corporation was originally an appellee but plaintiff voluntarily dismissed his appeal as to this defendant on 17 September 1984. The six defendants who remain will be referred to jointly as defendant appellees.

judgment against plaintiff. As to all defendant appellees except Owens-Corning, the trial court's orders were based exclusively on the ten-year statute of repose contained in former N.C. Gen. Stat. § 1-15(b). In these orders the trial court recited that plaintiff's claims were "barred by the provisions of N.C.G.S. Sec. 1-15(b), as written prior to its repeal on October 1, 1979." As to Owens-Corning, the trial court's order recited merely "that there is no genuine issue as to any material fact and that the Defendant is entitled to a Judgment as a matter of law . . . ."

The trial court apparently allowed Owens-Corning's motion for summary judgment on the ground that plaintiff would be unable at trial to show that he was ever exposed to any asbestos products manufactured, sold or distributed by this defendant. After examining the forecast of evidence before the trial court, we believe there is nothing in this forecast to demonstrate that plaintiff will not at trial be able to show an exposure to asbestos products manufactured, sold or distributed by Owens-Corning. We therefore reverse the entry of summary judgment in favor of Owens-Corning. Concluding that G.S. 1-15(b) has no application to claims arising from disease, we also reverse the trial court's entry of summary judgments in favor of all other defendant appellees.

I.

[1] Whether the trial court properly allowed Owens-Corning's motion for summary judgment depends on whether the forecast of evidence demonstrated that plaintiff at trial would not be able to show any exposure to asbestos products manufactured, sold or distributed by this defendant. The theory underlying this defendant's motion and the trial court's ruling is that the forecast of evidence demonstrates that plaintiff at trial "cannot produce evidence to support an essential element of his" claim. *Burnick v. Jurden*, 306 N.C. 435, 450, 293 S.E. 2d 405, 415 (1982); *Dickens v. Puryear*, 302 N.C. 437, 276 S.E. 2d 325 (1981).

Plaintiff's forecast of evidence tended generally to show as follows: He worked as an insulator from 1938 until 1979 on at least seventy-five jobs in nine states installing insulation at construction sites. In this work he used asbestos-containing cloth and cements. His work as an insulator required that he cut and saw asbestos-containing insulation products, the cutting and sawing of which produced dust which he breathed. He began experiencing

shortness of breath in the late 1960's, but it was not until August 1979, following a biopsy, that plaintiff was diagnosed as suffering from asbestosis, an irreversible scarring of the lung tissue caused by the presence of asbestos fibers. He filed his complaint on 29 July 1981.[2]

Owens-Corning's forecast of evidence tended to show that it manufactured asbestos-containing Kaylo pipe covering and Kaylo block in November 1972, but it stopped selling these products in early 1973. Owens-Corning's sales records showed that it did ship its Kaylo product in 1970 to a Carolina Power & Light Company job site at Roxboro, North Carolina, where plaintiff was working. The company sold its Kaylo product to plaintiff's employer, the Mancine-Klinchuck Company, Endicott, New York, in 1972, but the place where the product was actually delivered was not known.

Plaintiff's forecast of evidence regarding Owens-Corning's Kaylo tended to show he had been exposed to Kaylo pipe covering and block insulation during his working career. An affidavit filed by plaintiff tended to show that he was exposed to Kaylo on job sites where he worked as an insulator in 1945, 1954, 1957, 1958, and 1966-67. An affidavit of W. E. Thompson, one of plaintiff's coworkers, tended to show that he worked on various jobs with plaintiff as an insulator and that Kaylo was one of the products they used on these jobs in 1968-69, 1971-72, 1973-75, and 1976-77. Owens-Corning's answers to certain of plaintiff's interrogatories indicate that Kaylo was shipped to a number of job sites listed by plaintiff in his affidavit as work sites where he was exposed to asbestos-containing products. Plaintiff's own affidavit says that he was exposed to Kaylo pipe covering and block on job sites in 1970, 1954, 1956-57 and to "pipe covering and block" (brand name unspecified) in 1966-67 and 1973-75. According to plaintiff's deposition, he recalled specifically working with Kaylo as an insulator on a job for Carolina Power & Light Company in Moncure, North Carolina.

We agree with defendants' contention that at trial plaintiff's evidence must demonstrate that he was actually exposed to the

---

2. This original complaint was dismissed because plaintiff's prayer for damages violated Civil Procedure Rule 8(a)(2), but the order of dismissal permitted plaintiff to file a new action based on the same claim within one year. On 17 March 1982 plaintiff filed the action now under consideration.

alleged offending products. It will not be enough for plaintiff simply to show that various products were shipped to various job sites on which he worked. We are satisfied, however, that the forecast of evidence in the record at the summary judgment hearing falls far short of demonstrating that plaintiff will not be able at trial to show exposures to Owens-Corning's asbestos-containing product. Indeed, the forecast indicates that plaintiff will be able to make such a showing.

Summary judgment in favor of Owens-Corning, therefore, is reversed.

## II.

[2]   Whether entry of summary judgment in favor of defendants other than Owens-Corning was proper depends on whether N.C. Gen. Stat. § 1-15(b) (Interim Supp. 1976) (repealed 1979) applies to claims arising out of disease. That statute was enacted to become effective 21 July 1971, Ch. 1157, 1971 N.C. Laws 1706, amended in 1975, Ch. 977, § 2, 1975 N.C. Laws 3, and repealed effective 1 October 1979. Ch. 654, § 3, 1979 N.C. Laws 687, 689. It provided at all times material to the present case as follows:

> (b) Except where otherwise provided by statute, a cause of action, other than one for wrongful death or one for malpractice arising out of the performance or failure to perform professional services, having as an essential element bodily injury to the person or a defect in or damage to property which originated under circumstances making the injury, defect or damage not readily apparent to the claimant at the time of its origin, is deemed to have accrued at the time the injury was discovered by the claimant, or ought reasonably to have been discovered by him, whichever event first occurs; provided that in such cases the period shall not exceed ten years from the last act of the defendant giving rise to the claim for relief.

G.S. 1-15 (Interim Supp. 1976).

Plaintiff and *amicus*, the North Carolina White Lung Association, argue that G.S. 1-15(b) was never intended by the legislature to apply to claims arising out of a disease. After careful consideration, we agree.

In determining the intent of the legislature, the cardinal rule of construction is to consider the statute's purpose, the state of the law to which the statute was addressed, and the changes in that law the statute was designed to effect. *Stevenson v. Durham*, 281 N.C. 300, 188 S.E. 2d 281 (1972); *Galligan v. Chapel Hill*, 276 N.C. 172, 171 S.E. 2d 427 (1970); *Domestic Electric Service Co., Inc. v. Rocky Mount*, 20 N.C. App. 347, 201 S.E. 2d 508, *aff'd*, 285 N.C. 135, 203 S.E. 2d 838 (1974). We note, importantly, that G.S. 1-15(b) is not intended to be a statute of limitations governing all negligence claims, such as the statute of limitations contained in the first clause of G.S. 1-52(16). Its primary purpose was to change the accrual date from which the period of limitations begins to run on latent injury claims. In addition, it added a ten-year statute of repose which runs from "the last act of defendant giving rise to the claim for relief" and which applies only to latent injury claims.

The purpose of G.S. 1-15(b) was thoroughly considered and delineated in *Raftery v. Construction Co.*, 291 N.C. 180, 230 S.E. 2d 405 (1976). The Court noted in *Raftery* a line of cases which established the rule that the statute of limitations in negligence and warranty claims begins to run when the injury, however slight, is first inflicted, notwithstanding that the injured claimant might then be justifiably unaware of the injury. *Jewell v. Price*, 264 N.C. 459, 142 S.E. 2d 1 (1965); *Motor Lines v. General Motors Corp.*, 258 N.C. 323, 128 S.E. 2d 413 (1962); *Shearin v. Lloyd*, 246 N.C. 363, 98 S.E. 2d 508 (1957); *Lewis v. Shaver*, 236 N.C. 510, 73 S.E. 2d 320 (1952). *Motor Lines* held that a claim for breach of warranty in the sale of a truck accrued upon the sale, not upon the truck's subsequent destruction by fire because of a defect in its manufacture. *Jewell* followed with a similar holding in a case involving property damage from a fire caused by a defective oil burning furnace. *Shearin* and *Lewis* were medical malpractice actions involving, respectively, a sponge left within the plaintiff's body and the alleged unauthorized tying of plaintiff's Fallopian tubes. In each of the cases the Court held that the claim accrued when the injury to claimants first occurred, rather than when claimants discovered their injuries.

Plaintiffs Shearin and Lewis were first injured when the sponge was left in Shearin's body and Lewis's Fallopian tubes were mistakenly tied. Likewise plaintiffs in *Motor Lines* and

*Jewell* were first injured, *i.e.*, they suffered some loss, when they purchased latently defective products. The Court elaborated on this theory of claim accrual in *Jewell v. Price*, 264 N.C. at 461-62, 142 S.E. 2d at 3-4:

> Where there is either a breach of an agreement or a tortious invasion of a right for which the party aggrieved is entitled to recover even nominal damages, the statute of limitations immediately begins to run against the party aggrieved, unless he is under one of the disabilities specified in G.S. 1-17. . . . Nominal damages may be recovered in actions based on negligence. . . . The accrual of the cause of action must therefore be reckoned from the time the first injury, however slight, was sustained. . . . It is unimportant that the actual or the substantial damage does not occur until later if the whole injury results from the original tortious act. . . . '[P]roof of actual damage may extend to facts that occur and grow out of injury, even up to the day of the verdict. If so, it is clear the *damage* is not the cause of action'. . . . It is likewise unimportant that the harmful consequences of the breach of duty or of contract were not discovered or discoverable at the time the cause of action accrued.

The Court said in *Raftery*, 291 N.C. at 188-89, 230 S.E. 2d at 409-10:

> The purpose of G.S. 1-15(b) was to give relief to injured persons from the harsh results flowing from this previously established rule of law. By the enactment of this statute in 1971, the Legislature provided that a cause of action, having as an essential element bodily injury or a defect in property, 'which originated under circumstances making the injury, defect or damage not readily apparent to the claimant at the time of its origin,' is deemed to have accrued at the time of the injury, was discovered or ought reasonably to have been discovered by the claimant. Thus, the purpose of this statute was to enlarge, not to restrict the time within which an action for damages could be brought.

> To prevent the statute from subjecting tort feasors to suit for alleged acts or defaults so far in the past that evidence as to the event would be difficult to secure and intervening causes would be likely, though difficult to prove,

the Legislature added this proviso: '[p]rovided that *in such cases* the period [i.e., the period within which the action may be brought] shall not exceed ten years from the last act of the defendant, giving rise to the claim for relief.' (Emphasis added.) Expressly, the proviso is limited to 'such cases'; that is, *the proviso applies only to cases in which the bodily injury, or defect in property, for which damages are sought was not readily apparent to the claimant at the time of its origin.* In such case, the action must be brought within ten years from the wrongful act or default even though the plaintiff did not discover the injury until later. (Emphasis supplied.)

None of the cases toward which the statute was directed involved disease. They all involved situations in which it was possible to identify a single point in time when plaintiff was first injured.

A disease presents an intrinsically different kind of claim. Diseases such as asbestosis, silicosis, and chronic obstructive lung disease normally develop over long periods of time after multiple exposures to offending substances which are thought to be causative agents. It is impossible to identify any particular exposure as the "first injury." Indeed, one or even multiple exposures to an offending substance in these kinds of diseases may not constitute an injury. The first *identifiable* injury occurs when the disease is diagnosed as such, and at that time it is no longer latent. *See, generally, Borel v. Fiberboard Paper Products Corp.*, 493 F. 2d 1076, 1083 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974) (asbestosis; disease does not ordinarily manifest itself until "ten to twenty-five or more years after exposure"); *Rutledge v. Tultex Corp.*, 308 N.C. 85, 301 S.E. 2d 359 (1983) (chronic obstructive lung disease; 24 years' exposure to respirable cotton dust and cigarette smoking ultimately resulted in diagnosis); *Hansel v. Sherman Textiles*, 304 N.C. 44, 283 S.E. 2d 101 (1981) (chronic obstructive lung disease, or byssinosis; 34 years' exposure after which disease diagnosed); *Haynes v. Feldspar Producing Co.*, 222 N.C. 163, 22 S.E. 2d 275 (1942) (silicosis; 10 years' exposure before disease was diagnosable). In *Booker v. Medical Center*, 297 N.C. 458, 483, 256 S.E. 2d 189, 204 (1979), a hepatitis case, this Court recognized:

Most occupational diseases, however, are not the result of a single incident but rather of prolonged exposure to hazardous conditions or a disease-causing agent. *In such cases it is seldom possible to identify a specific isolated event to which the injury may be attributed.*

Even with diseases which might be caused by a single harmful exposure such as, for example, hepatitis, it is ordinarily impossible to determine which of many possible exposures in fact caused the disease. *Id.*

Both the Court and the legislature have long been cognizant of the difference between diseases on the one hand and other kinds of injury on the other from the standpoint of identifying legally relevant time periods. This is demonstrated by examination of some of the workers' compensation statutes and this Court's decisions interpreting them.

In *Blassingame v. Asbestos Co.*, 217 N.C. 223, 7 S.E. 2d 478 (1940), this Court had occasion to consider a then relatively recent amendment to the Workers' Compensation Act providing for compensation in cases of death or disability resulting from occupational disease, including asbestosis. Although the Workers' Compensation Act requires that an injured employee give his employer written notice of accident within thirty days after its occurrence, the statute construed then specifically barred occupational disease claims unless: (1) "written notice of the first distinct manifestation" of the disease was given to the employer within 30 days "after such manifestation"; (2) if death occurred, written notice of death was given by the beneficiary to the employer or the Industrial Commission within 90 days after death; and (3) the claim was filed within one year after "disablement or death." *Id.* at 231-32, 7 S.E. 2d at 483. Claimant's husband died 1 April 1937. Although treated by a physician in his last illness, cause of death was not available until an autopsy was performed and the autopsy filed on 10 May 1937. The autopsy listed cause of death as "pneumonia . . . ; asbestosis, early." *Id.* at 230, 7 S.E. 2d at 482. There was medical testimony from a number of physicians, largely through hypothetical questions, to the effect that asbestosis had contributed to the worker's death. The worker's widow gave notice to the employer and filed a claim for compensation with the Industrial Commission on 20 July 1937. The Industrial Com-

mission concluded that the periods of time for giving notice should begin to run from the time the asbestosis was diagnosed and that the first diagnosis of asbestosis was the autopsy report. This Court affirmed saying, "The cause of deceased's death could only be ascertained by autopsy, as above set forth, and notice was given within 90 days after discovery and action brought within one (1) year." *Id.* at 233, 7 S.E. 2d at 484.

In *Duncan v. Carpenter*, 233 N.C. 422, 64 S.E. 2d 410 (1951), claimant's lung disease rendered him unable to work in April 1948. The disease was first diagnosed in November 1948 as silicosis. Claimant filed his claim with the Industrial Commission on 25 April 1949, more than one year after he left work but less than a year after his disease was diagnosed. The Court was construing G.S. 97-58(b). Although that statute relieves an employee with asbestosis, silicosis, or lead poisoning from giving the employer thirty days' notice, it provides that in other occupational disease cases the 30-day-notice time period begins to run "from the date that the employee has been advised by competent medical authority that he has" the disease. G.S. 97-58(b). But another subsection of G.S. 97-58 requires that claims for occupational diseases "shall be barred unless . . . filed with the Industrial Commission within one year after death, disability or disablement as the case may be." G.S. 97-58(c).

Defendants argued that since plaintiff had not filed his claim with the Commission within one year of his disability or disablement, the claim was barred by the clear language of the statute. The Court, however, refused to so construe the statute. It said to do so "would make the time for filing a claim for compensation for an occupational disease identical with that fixed for filing a claim for an accident, resulting in injury or death . . . irrespective of the date the employee was advised by competent medical authority that he had such disease." 233 N.C. at 426, 64 S.E. 2d at 413. The Court applied the canon of construction that "where a strict literal interpretation of the language of a statute would contravene the manifest purpose of the legislature, the reason and purpose of the law should control, and the strict letter thereof should be disregarded." *Id.* at 426, 64 S.E. 2d at 413-14. The Court went on to hold that the legislature intended to measure the time for filing a claim for an occupational disease, not from the time of disablement, but from the time the employee was "notified by

competent medical authority that he had such disease." *Id.* at 426-27, 64 S.E. 2d at 414. The Court said:

> Were we to rule otherwise, it would be necessary to hold that it was the legislative intent to require an employee, in many instances, suffering from any one of these occupational diseases to make a correct medical diagnosis of his own condition or to file his notice and claim for compensation before he knew he had such disease, or run the risk of having his claim barred by the one year statute.

*Id.*

From the foregoing we see that when the legislature considered occupational diseases, it almost always equated the disease's manifestation or its diagnosis as being the "injury" from which various time periods began to run. The earliest version of the occupational disease statute required, for example, that the 30-day-notice-to-employer period began to run from the disease's "first distinct manifestation." Later the statute made the period begin to run from the time the employee was advised by medical authority that he suffered from the disease. We also see from the foregoing that this Court interpreted other statutes, which were less clear, consistently with the notion that in disease cases the event from which relevant time periods should be measured was the employee's notification of the disease's existence.

By this treatment of occupational disease claims, the legislature and the Court have recognized that exposure to disease-causing agents is not itself an injury. The body is daily bombarded by offending agents. Fortunately, it almost always is capable of defending itself against them and remains healthy until, in a few cases, the immune system fails and disease occurs. That, in the context of disease claims, constitutes the first injury. Although persons may have latent diseases of which they are unaware, it is not possible to say precisely when the disease first occurred in the body. The only possible point in time from which to measure the "first injury" in the context of a disease claim is when the disease is diagnosed. When the disease is diagnosed, it is no longer latent.

There was, therefore, no need in 1971 for the legislature to treat diseases as "latent injury claims" for the purpose of deter-

mining when legally material time periods begin to run. That point had already been well established by both the legislature and this Court in the occupational disease context as the date of diagnosis. It is extremely unlikely that the legislature or the Court would have adopted a time of accrual other than date of diagnosis for statute of limitation purposes in disease claims based on negligence. Yet if G.S. 1-15(b) is applied to disease then the time of claim accrual is not the date of diagnosis but the time the disease "was discovered or ought reasonably to have been discovered" — a time which may in some disease claims occur before actual diagnosis. It is inconceivable that the legislature enacted G.S. 1-15(b) in 1971 intending that claims for injuries caused by disease accrue before the disease is diagnosed.

The legislature, as noted above, was reacting to the law of *Jewell, Motor Lines, Shearin* and *Lewis* which permitted latent, undiscovered, first injury to cause the statute of limitations to begin running. In a disease claim, as we have demonstrated, the diagnosed disease is the first injury. A manifested, diagnosed disease is not latent. There was, therefore, no need for a statute changing the accrual date for disease claims, and the statute by its terms does not purport to do so. The only need was for a statute changing the accrual date for *latent* injury claims such as those in *Jewell, Motor Lines, Shearin* and *Lewis*, and the statute by its terms is directed to these type claims.

We are bolstered in our opinion that the legislature did not intend for G.S. 1-15(b) to apply to a disease claim by certain changes made in the bill as originally introduced and before its final enactment into law. As originally introduced, Senate Bill 572, entitled "A Bill to be Entitled an Act to Provide that a Cause of Action Accrues when Injury is or should have been Known," provided as follows:

> A cause of action where injury, *disease*, death or damage occurs shall not be deemed to accrue until (1) the injury or damage is actually inflicted or (2) death occurs or (3) the *disease*, damage or injury *is diagnosed* or should have reasonably been discovered, whichever event occurs later.

H.B. 572, Gen. Assembly of 1971, § 1 (codified at N.C. Gen. Stat. § 1-15(b) [Interim Supp. 1976]) (emphasis supplied). The bill was later amended so that the section in question read:

A cause of action which results in injury not immediately apparent shall not be deemed to accrue until (1) the injury or damage is actually discovered or (2) death occurs or (3) the *disease*, damage, or injury *is diagnosed* or should have reasonably been discovered, whichever event first occurs.

*Id.* (incorporating amendment of 20 May 1971) (emphasis supplied). As finally enacted the statute omitted all references to claims arising out of disease. Ch. 1157, § 1, 1971 N.C. Laws 1706.

In construing statutes, "[i]t is always presumed that the legislature acted with care and deliberation and with full knowledge of prior and existing law." *State v. Benton,* 276 N.C. 641, 658, 174 S.E. 2d 793, 804 (1970). In light of the statute's purpose, the state of the law when the statute was enacted, and the deliberate omission of reference to disease as this statute made its way through the legislative process, we are satisfied that the legislature intended the statute to have no application to claims arising from disease. G.S. 1-15(b) having no application to this case, plaintiff's claim accrued on the date he was diagnosed as having the disease asbestosis, and under G.S. 1-52(16) he had three years from that date to bring suit.

For the foregoing reasons, summary judgment in favor of all defendant appellees is

Reversed.

Justice BILLINGS did not participate in the consideration or decision of this case.

Justice MEYER concurring in part and dissenting in part.

As I understand the majority opinion, it holds that neither the repealed N.C.G.S. § 1-15(b) nor its successor N.C.G.S. § 1-52 (16) applies to occupational disease claims in general, and asbestosis claims in particular, in which the diagnosis was made prior to 1 October 1979 and, therefore, that there is no statute of repose applicable to those claims and that the statute of limitations applicable to all occupational disease claims, including asbestosis claims, is the usual three-year statute, N.C.G.S. § 1-52, which begins to run when the disease is "diagnosed."

As to Part I of the majority opinion relating to Owens-Corning in particular, the evidence in plaintiff's forecast that would tend to show exposure to that manufacturer's product is marginal at best but I would tend to agree with the majority that it is sufficient (though barely so) to survive a motion for summary judgment bottomed on that narrow basis.

I cannot concur in Part II of the majority opinion which concludes that our legislature did not intend that occupational disease cases in general and asbestosis in particular should be covered by the statute of repose contained in the then applicable but later repealed N.C.G.S. § 1-15(b). With regard to legislative intent, the majority seems to ascribe to the members of the General Assembly an unawareness of developments in the legal arena in the early 1970s, when that statute was enacted, that I find naive. At that point in time, delayed manifestation injuries, together with the time-delayed product injuries, constituted a giant wave that was breaking upon the courts. Many legal writers say the crest of that wave has now passed us, but I disagree. These two categories of cases may well dominate tort litigation in our courts in the decades of the 1980s and 1990s.

There are an estimated 25,000 asbestosis related suits pending in the United States, with perhaps 1,500 to 2,000 of them pending in the courts of this State and the United States District Courts in North Carolina, and the asbestosis cases are just the tip of the iceberg. Agent Orange plaintiffs are estimated to number 50,000 or more. There are estimated to be over 1,000 DES suits pending, with many more to come as more of the estimated three million DES daughters bring suit. Add to these the so-called cigarette and smokeless tobacco cases, the toxic shock syndrome cases, the atomic veterans radiation cases, the Dalkon Shield cases, the toxic waste cases, the formaldehyde cases, the microwave cases, and the cornucopia of other potential "occupational disease" cases; and the problems seem insurmountable.

The onslaught of these cases and the accompanying increase in the number and amount of jury awards are forcing some manufacturers into bankruptcy and resulting in raised insurance premiums of hundreds and even thousands of percent for others. The business and insurance worlds have been permeated by a feeling of crisis. As a result, a majority of state legislatures

enacted statutes like the repealed N.C.G.S. § 1-15(b) and its successor N.C.G.S. § 1-52(16), and federal legislation in the near future is not unlikely. To hold that our legislature intended that occupational disease cases (of all kinds and whatever that term may include) not be covered by the statute of repose if diagnosed prior to 1 October 1979 is nothing short of ludicrous.

Contrary to the majority, I conclude that our legislature specifically intended that the now repealed N.C.G.S. § 1-15(b) cover asbestosis claims in particular and occupational diseases claims in general. Beyond the inevitable recognition of the burgeoning problem as previously discussed, I find this affirmative expression in the words of the statute itself. The statute of repose then applicable, N.C.G.S. § 1-15(b) (Interim Supp. 1976, repealed 1979), provided, at all times pertinent to the present case, as follows:

> (b) Except where otherwise provided by statute, a cause of action, other than one for wrongful death or one for malpractice arising out of the performance or failure to perform professional services, having as an essential element bodily injury to the person or a defect in or damage to property which originated under circumstances making the injury, defect or damage not readily apparent to the claimant at the time of its origin, is deemed to have accrued at the time the injury was discovered by the claimant, or ought reasonably to have been discovered by him, whichever event first occurs; provided that in such cases the period shall not exceed ten years from the last act of the defendant giving rise to the claim for relief.

N.C.G.S. § 1-15(b) (Interim Supp. 1976).

I find the intent that occupational diseases should be covered in that (1) the statute specifically provided that it should apply "[e]xcept where otherwise provided by statute," and no other statute provided otherwise for asbestosis claims in civil actions; and (2) the statute also specifically excluded two categories of cases, wrongful death actions and malpractice actions in which the damage or injury was not readily apparent at the time of its origin; thus, it is obvious that although the legislature knew how to exclude from the repose statute certain categories of cases, it

did not exclude occupational disease claims in general or asbestosis claims in particular.

It is irrefutable that our legislature was well aware of the unique nature of asbestosis and silicosis claims as it had made specific provisions for their uniqueness in numerous parts of the North Carolina Workers' Compensation Act. N.C.G.S. § 97-57 through 97-64. Indeed, N.C.G.S. § 97-58(a) specifically provides (with exceptions relating to death claims not pertinent here):

> § 97-58. Claims for certain diseases restricted; time limit for filing claims.
>
> (a) . . . [A]n employer shall not be liable for any compensation for asbestosis unless disablement or death results within ten years of the last exposure to that disease . . . .

(At the time our legislature adopted the now repealed N.C.G.S. § 1-15(b) allowing the filing of civil suits within ten years, the time period in N.C.G.S. § 97-58(a) was only two years from the last exposure.)

Under the majority holding, today, even under the present N.C.G.S. § 97-58(a), the employee covered by the Workers' Compensation Act whose asbestosis was diagnosed prior to 1 October 1979 is barred after ten years from *the last exposure*; but the same worker, if not covered by the act, would not be barred by any statute of repose at all and could bring his action within three years of the diagnosis, though that diagnosis be made for the first time a half century or more after the last exposure. Our legislature could not have intended such an absurd result.

If my understanding of the majority opinion is correct, the majority has today removed any time bar whatsoever to a civil action on an asbestosis claim where the diagnosis was prior to 1 October 1979 so long as the claimant files his complaint within three years of the diagnosis. In such cases, the relationship between the claimant's employment and the diagnosis of the disease is no longer of any importance though the employment relationship may have terminated a half century or more prior to the diagnosis. Nor does it any longer matter in those situations that a claimant's last exposure was a half century or more prior to diagnosis. Nor that the claimant may have suffered severe respiratory problems for a half century or more — so long as his con-

dition had not been previously diagnosed as "asbestosis." Nor that the asbestosis claimant has suffered and been treated for a half century, if his condition had been misdiagnosed through the years as another condition.

It should be noted that although the majority opinion restricts its holding to civil actions for asbestosis claims in which the diagnosis was made prior to 1 October 1979 (and those suits must have been filed by 2 October 1982), it applies to literally thousands of claims already in the judicial pipeline. Indeed, we have already identified the possibility of some 1,500 to 2,000 such suits pending in this State.

Having personally concluded that the statute of repose— former N.C.G.S. § 1-15(b) as written prior to its repeal on 1 October 1979—is applicable to plaintiff's claim, I would vote to affirm the trial judge's granting of summary judgment for all defendants. I would also vote to hold that N.C.G.S. § 1-52(16) is applicable to all occupational disease claims in which the diagnosis occurred subsequent to the effective date of 1 October 1979, a fact which the majority seems to concede but does not state.