***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. The appealing party has shown good grounds to reconsider the evidence and amend the Opinion and Award; therefore, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner.
 PROCEDURAL HISTORY
The North Carolina Insurance Guaranty Association (hereinafter "NCIGA") originally filed a declaratory judgment action in Wake County Superior Court on October 26, 2000 in order to ascertain whether NCIGA is responsible for claims where the insurer insolvency occurred prior to January 1, 1993, but which were filed after that date. In the original complaint, NCIGA brought suit against sixteen employers for whom policies of insurance had been issued by insurers that had become insolvent prior to January 1, 1993 and against whom certain workers' compensation claims had been filed after January 1, 1993. NCIGA sought a declaratory judgment from the Court that it was not responsible in its role as administrator of the Stock and Mutual Security Fund Accounts to pay the workers' compensation claims.
After the dismissal of several of the original named employer defendants, NCIGA filed an amended complaint again naming sixteen employers as defendants and seeking the same relief. Sometime between the filing of the original and amended complaint, a number of employees or their representatives were allowed to intervene in the proceeding. Several employers and intervenors filed motions to dismiss the complaint filed by NCIGA alleging that the Superior Court lacked jurisdiction to hear the arguments.
Following a hearing on November 17, 2000, the employers' and intervenors' motions to dismiss were granted in an Order filed on June 12, 2001 pursuant to N.C.R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction). The NCIGA appealed and the Court of Appeals affirmed the trial court's ruling and found that the proper jurisdiction for determination of this issue was the North Carolina Industrial Commission. See NorthCarolina Ins. Guar. Ass'n v. Int'l Paper Co.,152 N.C. App. 224, 569 S.E.2d 285 (2002). The NCIGA appealed this ruling as well; however, the Supreme Court denied discretionary review. North Carolina Ins. Guar.Ass'n v. Int'l Paper Co., 356 N.C. 438, 572 S.E.2d 786
(2002).
On June 10, 2003, Chief Deputy Commissioner Stephen T. Gheen filed an Order granting the motion of NCIGA for Consolidation of Cases for Hearing and Determination of Issues for hearing on the Insurance Guaranty Association Act as follows:
 "1. It appears that no claim was filed with the NC Insurance Guaranty Association until after the final date set by the court for the filing of claims against the liquidator of the insolvent insurer that had issued a policy of workers' compensation insurance to the Employer in this case, and therefore the NC insurance Guaranty Association has no obligation for this claim under N.C. Gen. Stat. § 58-48-35(a)(1).
 2. It is unclear whether there is a "covered claim" as defined in N.C. Gen. Stat. § 58-48-20(4).
 3. It is unclear whether the Guaranty Association is obligated for this claim under N.C. Gen. Stat. § 58-48-35(a)(1) or is deemed the insurer under G.S. § 58-48-35(a)(2).
 4. It is unclear whether, if the Guaranty Association is not obligated for this claim or deemed the insurer under N.C. Gen. Stat. § 58-48-35, this claim is a claim presentable to the custodian and administrator of the Stock Reserve Account or the Mutual Reserve Account under N.C. Gen. Stat. § 58-48-125.
 5. It is unclear whether this claim was a "claim existing before January 1, 1993" G.S. § 58-48-110(4)."
This consolidated proceeding consists of the above captioned case and approximately one-hundred fifty (150) cases enumerated in the Order, hereinafter referred to as Related Cases, that are presently pending before the Industrial Commission that share these common issues for determination under the Insurance Guaranty Association Act.
 ***********
Based on the evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT A. History of plaintiff-employee's claim and Related Cases
1. The employees' claims in all of these cases involve workers' compensation insurance carriers that were declared insolvent prior to January 1, 1993.
2. The employees in all of these cases maintain that their respective claims for benefits for occupational disease under the Workers' Compensation Act were filed with the Industrial Commission within two years of (1) the date the employee was advised by competent medical authority that they had asbestosis or an asbestos-related disease; or (2) the date the employee became disabled as a result of asbestosis or an asbestos-related disease in accordance with N.C. Gen. Stat. § 97-58.
3. There is no evidence that these claims were the subject of any filings, proofs of claim, or written or verbal notices of any kind to the Industrial Commission, North Carolina Department of Insurance, or any of the liquidators or receivers of the pertinent insolvent workers' compensation insurers prior to 1993. The NCIGA did not receive any notice of these claims before 1993 and in many instances received no notice until the claims were filed with the Industrial Commission several years thereafter.
 B. Statutory and legislative history regarding insurance carrier insolvencies and Insurance Guaranty Association Act
4. In 1935, the General Assembly enacted Article 3 of Chapter 97 of the North Carolina General Statutes establishing "Security Funds" as mechanisms for the payment of workers' compensation awards rendered against employers whose workers' compensation insurance carriers had become insolvent. These Security Funds were comprised of two accounts the Stock Fund Account for insolvent stock insurance carriers and the Mutual Fund Account for insolvent mutual insurance carriers.
5. These Security Funds were financed by the assessment of solvent stock and mutual workers' compensation insurance carriers transacting business in the State of North Carolina. Once an insurance carrier became insolvent, the Commissioner of Insurance processed the claim in the place of the insolvent carrier and paid all compensable claims from the appropriate account.
6. In 1971, the NCIGA was created by N.C. Gen. Stat. § 58-48-1 et seq. to maintain accounts for the payment of various types of claims on behalf of insolvent insurers. The NCIGA consists of "members" which are all property and casualty insurance companies licensed to do business in the State of North Carolina. N.C. Gen. Stat. § 58-48-20(6). The funding for the NCIGA's payment of claims is derived from (1) assessments or premiums from its members based upon the percentage of relevant business conducted in North Carolina, N.C. Gen. Stat. § 58-48-35(a)(3); (2) the proceeds of special deposits previously made by insolvent insurers, N.C. Gen. Stat. §58-48-95; and (3) distributions from the estate of liquidation of an insolvent insurer to the extent it has made payments for permitted claims. N.C. Gen. Stat. § 58-48-50(b) (c).
7. Prior to 1993, the NCIGA was only responsible for various types of insurance company insolvencies, including home and automobile, but not workers' compensation. Until 1993, the Commissioner of Insurance continued to manage the Security Fund Accounts for insolvent workers' compensation carriers.
8. In 1992, the General Assembly enacted legislation amending the Insurance Guaranty Association Act (hereinafter "IGAA") and the Workers' Compensation Act to bring workers' compensation claims within the scope of the IGAA and under the administration of the NCIGA. See 1991 N.C. Sess. Laws 802, § 6. Therefore, commencing January 1, 1993, the NCIGA became responsible for workers' compensation claims involving insolvent carriers.
9. Senate Bill 726, "An Act Concerning the Worker's Compensation Security Fund" was introduced on April 18, 1991. This bill included extensive amendments to the IGAA. On May 9, 1991, the Senate Manufacturing and Labor Committee addressed this bill. These Senate Committee meeting minutes include that an insurance industry representative informed the committee that the bill was "correct" and "fully supported." The Senate Committee gave the bill a favorable report, and it was sent to the Senate floor for a vote on the same day. Senate Bill 726 received unanimous Senate approval on both the second and third readings meeting the bill crossover deadline.
10. One year later, in June 1992, the House of Representatives took up consideration of Senate Bill 726. William R. Gilkeson, Counsel to the House Committee on Economic Expansion, authored a memorandum dated June 10, 1992 which stated that the Senate passed version of the IGAA amendments would merge the Stock and Mutual Security Funds thereby pooling their assets and liabilities. The memo further stated that at that time the Stock Fund had assets well in excess of liabilities while the Mutual Fund had more liabilities than assets due to more mutual company failures. The memo went on to state that there was disagreement over the use of Stock Fund assets to cover Mutual Fund liabilities and a compromise had been reached as embodied in the Proposed House Committee Substitute bill that the committee was then considering. In summary, the memo stated that the IGAA amendments would abolish both current Security Funds and set up new separate accounts with assessment powers to pay all then-current liabilities of the Security Funds and establish a new account for coverage of all claims filed on or after January 1, 1993 against both failed mutual and stock companies.
11. George Teague, legal counsel to the NCIGA, testified about the IGAA amendments before the House Committee on Economic Expansion on June 17, 1992. His written statement which was presented to the House Committee was identified as "Attachment I" to the official meeting minutes. Mr. Teague's written statement submitted to the House Committee includes the following statements regarding the Senate Bill 726:
 "Provides better security for workers in North Carolina."
 "The bill provides for the handling of these existing liabilities in an equitable manner and provides continuing assurance that sufficient moneys will be available to satisfy those obligations."
 "By placing workers compensation insurance under the jurisdiction of the Guaranty Act, the expertise of the Guaranty Association in handling insurance insolvencies can be brought to bear on workers compensation insurance insolvencies."
12. In summary, the House Committee meeting minutes reflect that Mr. Teague informed the committee that the sole purpose of the amendment was to transfer responsibility for the workers' compensation security funds from the Department of Insurance to the NCIGA so that the state could"provide better security for workers in North Carolina" by protecting them from carrier insolvencies. (emphasis added). The minutes from the June 17, 1992 House Committee meeting indicate that the NCIGA, the American Insurance Association, the Department of Insurance, the State Treasurer, and the insurance industry all supported the transfer of workers' compensation security funds from the administration of the Department of Insurance to the NCIGA. The House Committee favorably reported the Proposed House Committee Substitute for Senate Bill 726 on June 19, 1992. Senate Bill 726 was unanimously approved by the House of Representatives on June 23 and 24, 1992 and again received unanimous votes of concurrence from the Senate. The IGAA Amendments were codified as Session Law 802 and became effective on January 1, 1993.
13. Following enactment of the 1992 amendments, the NCIGA was statutorily required to maintain three distinct accounts — the separate stock and mutual fund accounts for then-current liabilities and a new joint account for future claims. The stock and mutual fund accounts were a depository for funds maintained by the former Security Funds pursuant to N.C. Gen. Stat. § 58-48-105(a) and (b).
14. In accordance with N.C. Gen. Stat. § 58-48-125, the NCIGA is to use the two old Security Funds "to pay the claims against insolvent stock workers' compensation insurers and insolvent mutual workers' compensation insurers, respectively, pursuant to N.C. Gen. Stat. § 58-48-110(4) wherethe insolvency occurred prior to January 1, 1993." (emphasis added). This purpose of the accounts is further emphasized in N.C. Gen. Stat. § 58-48-110
which provides that the accounts created in the NCIGA pursuant to N.C. Gen. Stat. §§ 58-48-115 and 58-48-120 shall be used to (1) receive the balance of the former Security Funds, (2) receive assessments from members for any shortfalls of the Security Funds, (3) receive interest on the assets of the Funds, (4) pay for claims made against the securityfunds but only for claims existing prior to January 1, 1993, and (5) refund any funds remaining after all liabilities have been paid. (emphasis added).
15. Since the General Assembly mandated that the two pre-1993 Security Funds remain separate from each other as well as the new account, it was necessary to create a chronological demarcation line to distinguish which funds should pay particular claims of insolvent insurers. The demarcation date established by the IGAA amendments to determine which fund is liable for claims is based purely on the date of the insurance company's insolvency. Thus, all claims against insurance carriers who were insolvent prior to January 1, 1993 and where the claims "existed" prior to January 1, 1993, are paid out of one of the two old Security Funds transferred from the Department of Insurance to the NCIGA; whereas, claims against insurance carriers who became insolvent after the January 1, 1993, demarcation date are to be paid out of the new account. The new account is a joint workers' compensation account wherein both mutual and stock fund carriers are assessed.
16. Thus, the NCIGA currently administers three workers' compensation funds which have different responsibilities depending on the date of the specific insurance carrier's insolvency. The two old Security Funds are to be used to pay claims where the insolvency occurred prior to 1993 and the claim existed prior to 1993 pursuant to N.C. Gen. Stat. § 58-48-110(4). The new account pays workers' compensation claims where the carrier's insolvency occurred on or after January 1, 1993 and the claim qualifies as a "covered claim" as defined by N.C. Gen. Stat. § 58-48-20(4). Upon examination of the statutory and legislative history of the IGAA, the original statutory mandate and continual purpose of the IGAA since its inception in 1935 and throughout all subsequent amendments has been and remains protection of all policyholders from various insurance insolvencies. The legislative history of the IGAA, in its entirety, clearly demonstrates that the General Assembly never intended to arbitrarily exclude a particular class of claimants or create a time gap in coverage for latent disease claims from the IGAA's protections. The IGAA's protections were intended to pertain to all claims against insolvent insurers and extend to both employee-beneficiaries of workers' compensation benefits and employers who purchased workers' compensation insurance coverage in compliance with Chapter 97 provisions.
17. More specifically, the recorded legislative history of the 1992 amendments to the IGAA is absent of any discussion envisioning the possibility of a lack of coverage for any employee, much less those with latent disease claims. On the contrary, the committee meetings, notes, and written submissions from interested parties all concur that these law changes would ensure even better protection and avoidance of financial loss for employees and employers alike. So as to effectuate this purpose, the General Assembly even went so far as to transfer the administration of workers' compensation claim insolvencies to the entity they felt was the most adept and experienced in handling these matters, the NCIGA.
 C. Definition of "Existing Claims"
18. N.C. Gen. Stat. § 58-48-5 (emphasis added) Purpose of Article reads as follows:
 "The purpose of this article is to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers."
19. N.C. Gen. Stat. § 58-48-15 (emphasis added) Construction reads as follows:
 "This Article shall be liberally construed to effect the purpose under G.S. § 58-48-5 which shall constitute an aid and guide to interpretation."
20. N.C. Gen. Stat. § 58-48-100. Statute of repose reads in part as follows:
 "(a) Notwithstanding any other provision of law, a covered claim with respect to which settlement is not effected with the Association, or suit is not instituted against the insured of an insolvent insurer or the Association, within five years after the date of entry of the order by a court of competent jurisdiction determining the insurer to be insolvent, shall thenceforth be barred forever as a claim against the Association."
 Neither the IGAA nor any other North Carolina General Statute containsany mention of a statute of repose for latent diseases cases.
 21. The purposes of the newly created Stock and Mutual Security Fundspursuant to the 1992 amendments of the IGAA is codified in part as follows:
 § 58-48-110. Purpose of the accounts.
 "The purpose of the accounts created in the Association pursuant to G.S. § 58-48-115 and G.S. § 58-48-120 of this Article shall be solely to:
 (4) Pay stock or mutual carrier claims made against the security funds established under G.S. § 97-107 and G.S. § 97-114, but only for claims existing before January 1, 1993;"
22. The 1992 amendments to the IGAA provided for future assessments of stock and mutual insurance companies to supplement the newly created Stock and Mutual Security Funds should the reserves be insufficient to pay all liabilities for claims existing before January 1, 1993. N.C. Gen. Stat. §§ 58-48-115 and 120 provide the mechanisms for additional assessments to pay all such compensable claims where liability lies with the Stock and Mutual Security Fund accounts. Mr. Teague's written comments submitted at the House Committee meeting regarding these amendments include the following statement:
 "Under the bill the two Funds would be phased out — each Fund remaining responsible for paying out the existing liabilities (i.e. claims of previously insolvent workers compensation carriers)."
This is clear evidence that the General Assembly was fully informed that existing liabilities of previously insolvent workers' compensation insurance carriers would be paid by the Security Funds.
23. Excluding certain employees from IGAA coverage before knowledge of their claims would leave many employees with the possibility of no means of recovery for their injuries, such as when a former employer is no longer in business, or could burden employers with the costs of some claims for which they have paid insurance premiums with the expectation of having coverage for all compensable workers' compensation claims and the safety net of the NCIGA should their insurance carrier later become insolvent. Nothing in the legislative history of the 1992 amendments would contradict over seventy years of legislative intent regarding protection for all policyholders against insurer insolvencies.
24. Before the NCIGA may discontinue coverage of any type of insurance, it must act in accordance with N.C. Gen. Stat. § 58-48-90
which states as follows in part:
N.C.G.S. § 58-48-90 Termination; distribution of funds
 The Commissioner shall by order terminate the operation of the North Carolina Insurance Guaranty Association as to any kind of insurance covered by this Article with respect to which he has found, after hearing, that there is in effect a statutory or voluntary plan which:
 Is a permanent plan which is adequately funded or for which adequate funding is provided;
 Extends, or will extend to the North Carolina policyholders and residents protection and benefits with respect to insolvent insurers not substantially less favorable and effective to such policyholders and residents than the protection and benefits provided with respect to such kind of insurance under this Article
N.C. Gen. Stat. § 58-48-90 ensures that a new insolvency plan that protects all policyholders with the same benefits and protections they would have received otherwise under the IGAA must be in place before the NCIGA may discontinue coverage as to any type of insurance. None of the insurance carriers in this case or the related cases received approval from the Commissioner of Insurance to terminate coverage for insolvent claims by the NCIGA prior to their insolvencies.
25. N.C. Gen. Stat. § 58-48-130 provides for dissolution and refund of excess moneys in the Stock and Mutual Security Funds accounts to member insurers following the satisfaction of all liabilities. These funds have not yet been dissolved in accordance with this statute.
26. N.C. Gen. Stat. § 58-48-20(4) defines "covered claims" for purposes of NCIGA coverage for all claims where the insurer insolvency occurred on or after January 1, 1993. All covered workers' compensation claims that involve an insurer insolvency occurring on or after January 1, 1993 will be paid out of the new workers' compensation account as prescribed in N.C. Gen. Stat. § 58-48-25. The definition of "covered claim" includes no exclusions for latent disease claims occurring on or after January 1, 1993.
27. N.C. Gen. Stat. § 58-48-35 defines the powers, duties, and obligations of the NCIGA with regard to administration and payment of "covered claims."
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The following rules of statutory construction and legislative intent espoused by North Carolina appellate courts provides guidance regarding proper interpretation of the IGAA.
a. "Legislative intent controls the meaning of a statute. The primary rule of construction of a statute is to ascertain the intent of the legislature and to carryout such intention to the fullest extent. To determine legislative intent, a court must analyze the statute as a whole, considering the chosen words themselves, the spirit of the act, and the objectives the statute seeks to accomplish. Brown v. Flowe,349 N.C. 520, 507 S.E.2d 894 (1998).
b. "Where a statute is ambiguous, judicial construction must be used to ascertain the legislative will. The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." Burgess v.Your House of Raleigh, Inc., 326 N.C. 205, 209.388 S.E.2d 134, 136-37 (1990).
c. "When the plain language of a statute proves unrevealing, a court may look to other indicia of legislative will, including: `the purposes appearing from the statute taken as a whole, the phraseology, the words ordinary or technical, the law as it prevailed before the statute, the mischief to be remedied, the remedy, the end to be accomplished, statutes in parimateria, the preamble, the title, and other like means[.]'" Proposed Assessments of Additional Sales Use Tax v. Jefferson-Pilot Life Ins. Co., 589 S.E.2d 179,180-81 (2003). "Strict literalism will not be applied to the point of producing absurd results.'" Id. at 180.
d. "Where a literal interpretation of the language of a statute would contravene the manifest purpose of the statute, the reason and purpose of the law will be given effect and the strict letter thereof disregarded." Inre Expungement of Spencer, 140 N.C. App. 776, 778-79,538 S.E.2d 236, 238 (2000).
e. A construction of a statute which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done without doing violence to the legislative language. North CarolinaBaptist Hospitals, Inc. v. Mitchell, 323 N.C. 528,374 S.E.2d 844 (1988).
f. In determining the intent of the legislature, the cardinal rule of construction is to consider that statute's purpose, the state of the law to which the statute was addressed, and the changes in that law the statute was designed to effect. Stevenson v. Durham,281 N.C. 300, 188 S.E.2d 281 (1972); Galligan v. ChapelHill, 276 N.C. 172, 171 S.E.2d 427 (1970); DomesticElectric Service Co., Inc. v Rocky Mount, 20 N.C. App. 347,201 S.E.2d 508, aff'd 285 N.C. 135, 203 S.E.2d 838
(1974).
2. The stated purpose of the IGAA, namely, "to avoid financial loss to claimants or policyholders because of the insolvency of an insurer," compels coverage of this claim and the related cases. Denying coverage of any compensable claims merely because the insurer insolvency occurred prior to January 1, 1993, would serve to contravene the Act's stated purpose and manufacture an arbitrary gap in insolvency coverage for certain employees and employers. Such a result was clearly not intended by the North Carolina General Assembly. N.C. Gen. Stat. § 58-48-5.
3. The construction clause of the IGAA, "shall be liberally construed to effect the purpose under N.C. Gen. Stat. § 58-48-5 which shall constitute an aid and guide to interpretation," provides explicit direction regarding the appropriate interpretation and application of the IGAA. Therefore, in accordance with the explicit instructions of the General Assembly, the IGAA should be liberally interpreted so as to ensure effectuation of the purpose of loss avoidance due to insurer insolvency. N.C. Gen. Stat. § 58-48-15.
4. The IGAA does not include a definition of the phrase "claims existing" as used in N.C. Gen. Stat. §58-48-110(4). The legal definition of "claim" is a cause of action which accrues when a situation or state of facts occurs which would entitle a party to sustain an action and give him the right to seek a judicial remedy in his behalf. Black's Law Dictionary, 6th edition. Merely because the Workers' Compensation Act did not allow the claims of the employee in this case and the Related Cases to be filed with the Industrial Commission until the employee received a diagnosis of asbestosis from a competent medical authority does not mean that these were not "claims existing" as of January 1, 1993. Latent things actually do exist; they simply are not known to exist. In other words, latent diseases by their very nature are in existence prior to the time such notice occurs that they are in existence. The employee in this case and the Related Cases were diagnosed with latent diseases wherein the last injurious exposure to the disease causing agent occurred prior to January 1, 1993; thus, these claimants' latent diseases existed prior to and were "claims existing" as of January 1, 1993.
5. As the provisions in N.C. Gen. Stat. § 58-48-35
only apply to "covered claims" wherein the insurer insolvency occurred after January 1, 1993 that are subject to NCIGA coverage and payment from the new workers' compensation account, these portions of the IGAA have no application on the determination of coverage of "claims existing" prior to January 1, 1993. N.C. Gen. Stat. §§ 58-48-20(4), 25, and 35(a)(1) 
(a)(2).
6. Prior to the enactment of the 1992 amendments to the IGAA, the issue of a statute of repose for latent diseases was addressed in an asbestos products liability case, Wilder v. Amatex Corp., 314 N.C. 550, 336 S.E.2d 66
(1985), which held that statues of repose do not apply to latent disease claims in North Carolina. Writing for the Court, Chief Justice Exum explained, `[b]oth the Court and the legislature have long been cognizant of the difference between diseases on the one hand and other kinds of injury on the other from the standpoint of identifying legally relevant time periods." Id. at 558, 336 S.E.2d at 71. "A disease presents an intrinsically different kind of claim. Diseases such as asbestosis, silicosis, and chronic obstructive lung disease normally develop over long periods of time after multiple exposures to offending substances. Id. At 557,336 S.E.2d at 70.
The Court said:
 Were we to rule otherwise, it would be necessary to hold that it was the legislative intent to require an employee, in many instances, suffering from any one of these occupational diseases to make a correct medical diagnosis of his own condition or to file his notice and claim for compensation before he knew he had such disease, or run the risk of having his claim barred by the one year statute.
 Wilder p. 560.
The Court went on to say:
 There was, therefore, no need in 1971 for the legislature to treat diseases as "latent injury claims" for the purpose of determining when legally material time periods begin to run. That point had already been well established by both the legislature and this Court in the occupational disease context as the date of diagnosis. It is extremely unlikely that the legislature or the Court would have adopted a time of accrual other than date of diagnosis for statute of limitation purposes in disease claims based on negligence. Yet if G.S. 1-15(b) is applied to disease then the time of claim accrual is not the date of diagnosis but the time the disease "was discovered or ought reasonably to have been discovered" a time which may in some disease claims occur before actual diagnosis. It is inconceivable that the legislature enacted G.S. 1-15(b) in 1971 intending that claims for injuries caused by disease accrue before the disease is diagnosed.
 Id. At 561. (emphasis supplied).
"[T]he legislature and the Court have recognized that exposure to a disease-causing agent is not itself an injury . . . The only possible point in time from which to measure the `first injury' in the context of a disease claim is when the disease is diagnosed." Id. At 560,336 S.E.2d at 72. The Wilder Court also said it was "inconceivable" to conclude that North Carolina's statutes of repose would bar claims for occupational diseases which will not develop until many years after initial exposure to the disease causing agent. Thus, the Wilder Court made it clear that when a statute setting time limitations has the result of excluding occupational disease claims, it will generally be assumed that the legislature did not intend to exclude latent claims before the diagnosis.
7. The Wilder Court clearly set forth that the legislature intended to measure the time for filing a claim for a latent disease, not from the time of disablement, but from the time the employee was "notified by competent medical authority that he has such disease." Id. At 560. In making this holding, the Wilder court carved an all encompassing exception regarding time limitations for filing of all latent disease claims and the process by which such claims are handled. In summary,Wilder instructs that latent diseases are in existence from the time of exposure to the disease causing agent and legal redress for such is not measured from the time of existence but from the time of knowledge of the existence. As such, no statute of repose applies to any latent disease claims and the claims of the employee in this case and the Related Cases were therefore "claims existing" pursuant to N.C. Gen. Stat. § 58-48-110(4) as of January 1, 1993 as their asbestos exposure had occurred prior to that date. Denying IGAA coverage of these claims would frustrate the stated purpose of the Act and manufacture an arbitrary gap in coverage for certain employees and employers that contravenes applicable case law regarding latent disease claims.
8. In Gardner v. Asbestos Corp. Ltd., 634 F. Supp. 609 (W.D.N.C. 1986), one of the first federal court decisions to evaluate the Wilder
exception, Judge Sentelle noted specifically that "the State Supreme Court does not consider disease to be included within a statute of repose directed at personal injury claims unless the Legislature expressly expands the language to include it." Id. Since Wilder and its progeny were decided, various statutes of repose have been amended in North Carolina; however, not one amendment has specifically applied a statute of repose to any latent disease claims. Using this standard to determine whether or not a statute of repose should be applicable to the claims in this case, it is clear that the General Assembly has not intended such. Thus, the claims of the employee in this case and the Related Cases are not subject to any statute of repose.
9. "In construing statutes, `[i]t is always presumed that the legislature acted with care and deliberation and with full knowledge of prior and existing law.'" Wilder, 314 N.C. at 562, 336 S.E.2d at 73
(quoting State v. Benton, 276 N.C. 641, 658, 174 S.E.2d 793, 804 (1970)). The Wilder court also made the following comment concerning legislative intent regarding a statute of repose for latent diseases:
 In light of the statute's purpose, the state of the law when the statute was enacted, and the deliberate omission of reference to disease as this statute made its way through the legislative process, we are satisfied that the legislature intended the statute to have no application to claims arising from disease. G.S. 1-15(b) having no application to his case, plaintiff's claim accrued on the date he was diagnosed as having the disease asbestosis, and under G.S. 1-52(16) he had three years from that date to bring suit.
 Id. At 562.
The absence of a clear statute of repose that applies to latent disease claims clearly denotes that the General Assembly has never intended to impose a statute of repose on such. The bill wherein the statute of repose at N.C. Gen. Stat. § 58-48-100 was originally created was ratified on July 4, 1985. The General Assembly could have amended the IGAA to achieve the practical effect of creating a statute of repose for latent disease claims by including a section similar to N.C. Gen. Stat. §58-48-100(a) applying to the transferred funds, eliminating the mechanism for all future assessments when needed to meet the obligations of the transferred funds, or setting a specific time for the transferred funds to be dissolved rather than stating the Stock and Mutual Security Funds "shall be dissolved when all liabilities have been satisfied." Since the General Assembly did not utilize any of the aforementioned measures to ostensibly create a statute of repose for latent disease claims, it is clear that the phrase "claims existing" was intended only as an insolvency demarcation line rather than a synonym for "claim accrues." The entire legislative process concerning the IGAA amendments including committee study and hearings and passage by both Houses took place over the course of both the 1991 and 1992 Regular Sessions of the General Assembly. Consequently, the General Assembly had ample time to study the current law and proposed amendments to determine all changes necessary to satisfy their intent. Applying this rule of statutory construction as enunciated by the Wilder court also leads to the conclusion that the General Assembly had no intention of subjecting latent disease claims to the statute of repose at N.C. Gen. Stat. § 58-48-100.
10. "Claims existing" was merely meant to convey the existing liabilities of insurers who had become insolvent prior to the demarcation date of January 1, 1993. Since the General Assembly has not specifically created a statute of repose that applies to the transferred funds,Wilder governs in this situation and the latent disease claims of the employee in this case and the Related Cases are "claims existing" pursuant to N.C. Gen. Stat. § 58-48-110(4).
11. As the claims of the employee in this case and the Related Cases meet the definition of "claims existing" prior to January 1, 1993, as stated in N.C. Gen. Stat. § 58-48-110(4), the Stock and Mutual Security Funds in N.C. Gen. Stat. §§ 58-48-115 and 58-48-120 are liable for payment of these claims. N.C. Gen. Stat. § 58-48-125.
12. N.C. Gen. Stat. § 58-48-90 provides a mechanism to ensure all policyholders are protected should an insurance carrier become insolvent. This statute is all-inclusive and does not allow for the exclusion of one claimant or particular class of claimants; thus, an interpretation excluding latent disease claims is improper considering the complete text of this statute. As none of the insolvent insurance carriers have been allowed to terminate coverage by NCIGA in accordance with N.C. Gen. Stat. § 58-48-90, all compensable claims of these insolvent insurance carriers that existed prior to January 1, 1993 must be satisfied by the Stock and Mutual Security Funds in N.C. Gen. Stat. §§ 58-48-115 and58-48-120.
13. N.C. Gen. Stat. § 58-48-130 details the circumstances under which the transferred funds in the Stock and Mutual Security Funds may be dissolved and distributed to the member insurers. These funds must remain active until all liabilities of insurers who became insolvent prior to January 1, 1993 have been paid. As the dissolution clause contains no provisions excluding latent disease claims from these outstanding liability calculations, the Stock and Mutual Security Funds are available for payment of such claims.
14. Considering the language of the IGAA as a whole, including the purpose and construction section and applicable case law regarding latent disease claims, it is clear that the General Assembly intended to provide coverage in this case and the Related Cases because the subject latent disease claims did exist prior to January 1, 1993 even though they had not yet manifested themselves. The purpose of the NCIGA is to serve as a safety net for all policyholders of insolvent insurance companies no matter what other circumstances arise. Although employers are directly liable for payment of workers' compensation benefits if uninsured, any interpretation of the IGAA wherein an employee is faced with an insolvent insurance carrier on the risk and employer is no longer in business would deviate greatly from the fundamental nature and legislative intent of the IGAA.
15. It is clear that the General Assembly intended that "claims existing" in N.C. Gen. Stat. § 58-48-110(4) be defined as claims of previously insolvent workers' compensation carriers, or in other words, the existing liabilities of every insurance carrier who became insolvent prior to January 1, 1993. Wilder provides distinct guidance that latent disease claims should not be excluded from this definition of "claims existing." Thus, this wholly encompassing definition of "claims existing" coupled with the assessment power given to the NCIGA to ensure the transferred funds were sufficient to cover all liabilities, implies that the purpose of the transferred funds is to pay all claims, including latent disease claims, against insurance companies who became insolvent prior to January 1, 1993.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission AFFIRMS the holding of the Deputy Commissioner and enters the following:
 AWARD
1. All claims of the employee in this claim and the Related Cases deemed compensable pursuant to the Workers' Compensation Act are included in the coverage of the North Carolina Insurance Guaranty Association and shall be paid from the appropriate Stock and Mutual Security Funds as provided for in N.C. Gen. Stat. Chapter 58, Article 48.
2. The motion of defendant-North Carolina Insurance Guaranty Association to dismiss is hereby DENIED.
3. Defendant-North Carolina Insurance Guaranty Association shall pay the costs due the Commission.
This the ___ day of February 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER