RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re: DOW CORNING CORPORATION,

     *Reorganized Debtor.*

_____

No. 13-1497

PAMELA D. SUTHERLAND,

     *Plaintiff-Appellant,*

   *v.*

DCC LITIGATION FACILITY, INC.,

     *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. I:05-cv-30276—Denise Page Hood, District Judge.

Argued: January 30, 2014

Decided and Filed: February 20, 2015

Before: MERRITT, SUTTON, and STRANCH, Circuit Judges

_____

## COUNSEL

**ARGUED:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. Robert D. Goldstein, GARAN LUCOW MILLER, P.C., Grand Blanc, Michigan, for Appellee. **ON BRIEF:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. Robert D. Goldstein, Timothy J. Jordan, GARAN LUCOW MILLER, P.C., Grand Blanc, Michigan, for Appellee.

     STRANCH, J., delivered the opinion of the court in which MERRITT, J., joined. SUTTON, J. (pp. 12–15), delivered a separate dissenting opinion.

1

---

**OPINION**

---

JANE BRANSTETTER STRANCH, Circuit Judge: In 1988 Pamela Sutherland received breast implants in North Carolina. She filed suit in the Middle District of North Carolina five years later, after learning that the silicone in her implants could be causing a variety of serious medical problems. The Silicone's manufacturer, Dow Corning, filed for bankruptcy in the Eastern District of Michigan, and Sutherland's suit was transferred there. In 2012, twenty-four years after Sutherland received the implants, the district court concluded that Sutherland's claim was barred by Michigan's statute of limitations and granted summary judgment to the defendant. The district court should have applied North Carolina's law instead of Michigan's, and should have concluded that there was a genuine factual issue as to whether Sutherland's claim was timely-filed under North Carolina law. We therefore REVERSE the district court and remand for proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

In 1988 Pamela Sutherland, a Virginia resident, received breast implants at Duke University Hospital in North Carolina. The silicone-based filling in the implants was produced by Dow Corning, whose corporate headquarters is in Michigan. In 1993 Sutherland filed suit in the Middle District of North Carolina alleging that the silicone in her implants was causing a wide range of serious health problems. Sutherland's was one of tens of thousands of silicone-related cases brought against Dow Corning. A multidistrict litigation panel transferred the cases to the Northern District of Alabama where, in 1994, a class settlement was reached. Sutherland opted out of the class. In 1995 Dow Corning filed for bankruptcy in the Eastern District of Michigan and Sutherland's claim was transferred to that district as "related to" the bankruptcy, pursuant to 28 U.S.C. § 157(b)(5). *See In re Dow Corning Corp.*, 86 F.3d 482, 485–88 (6th Cir. 1996); *In re Dow Corning Corp.*, 113 F.3d 565 (6th Cir. 1997). After a series of appeals, *see id.*, the district court asserted jurisdiction over all silicone-related tort claims against Dow Corning. The district court established the procedures for opt-out claimants in a series of global case management orders. As part of the bankruptcy reorganization, Dow Corning agreed to create

and fund a DCC Settlement Facility to handle the class action and a DCC Litigation Facility ("DCC") to deal with opt-out claims.

In 2009, after settlement negotiations failed, DCC moved to certify the case for trial. The district court certified the case and ordered Sutherland to file a new complaint, which Sutherland filed on January 5, 2010, and DCC answered on January 19. The case moved towards trial. Sutherland was deposed on November 2, 2011, roughly 23 years after she received the implants and 18 years after first filing suit. In May 2012 DCC filed five separate motions for summary judgment, two of which are relevant to this appeal: One motion argued that Sutherland's claim was time-barred by the relevant statute of limitations; the other argued that Sutherland had failed to provide evidence of general causation.

The district court granted summary judgment to DCC on statute-of-limitations grounds and explicitly declined to address as unnecessary any of DCC's other arguments. The court concluded that, although North Carolina, Virginia, and Michigan law might apply to Sutherland's claim, a choice of law analysis was unnecessary and applied Michigan law. There was, the district court found, no question that Sutherland's claim accrued shortly after she received the implants, and no question that her claim was untimely. This appeal followed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Geiger v. Tower Auto.,* 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As the party seeking summary judgment, DCC must show there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). All facts, including inferences, are viewed in the light most favorable to Sutherland, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The central issue is whether the evidence presents a sufficient disagreement regarding whether Sutherland's claims are time-barred to require submission of Sutherland's claims to a jury or whether the evidence is so one-sided that DCC must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 251–52 (1986).

In resolving issues of state law, the panel looks to "the final decisions of that state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358-59 (6th Cir. 2013). We "usually defer" to our sister circuits' analyses of the law of the states within their respective borders. *U.S. v. Maness*, 23 F.3d 1006, 1008 (6th Cir. 1994); *Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 422 n.4 (6th Cir. 2006); *see also Dawn Equip. Co. v. Micro-Trak Sys., Inc.*, 186 F.3d 981, 989 n.3 (7th Cir. 1999). *Mellon Bank, N.A. v. Ternisky*, 999 F.2d 791, 796 (4th Cir. 1993). Unless the home circuit has "disregarded clear signals emanating from the state's highest court pointing towards a different rule" we will avoid creating "the oddity of a split in the circuits over the correct application" of one state's law. *Abex Corp. v. Maryland Cas. Co.*, 790 F.2d 119, 125 (D.C. Cir. 1986) (internal citations and quotation marks omitted); *see also Curtis 1000*, 197 F. App'x at 422 n.4 (quoting *Abex*, 790 F.2d at 125).

## III.  CHOICE OF LAW ANALYSIS

Although Sutherland's case came to the Middle District of North Carolina via diversity jurisdiction, it ended up in the Eastern District of Michigan by virtue of bankruptcy jurisdiction. The district court (that is, the Eastern District of Michigan) originally obtained jurisdiction over this case pursuant to 28 U.S.C. § 1334(b), which grants "the district courts . . . original but not exclusive jurisdiction of all civil proceedings . . . related to cases under title 11." *See Dow Corning*, 86 F.3d at 489. Sutherland's claim was thus "related to" the Dow Corning bankruptcy—it conceivably could have had an effect on the Dow Corning estate. *See id.* at 489.

Sutherland's claim was transferred to the Eastern District of Michigan pursuant to 28 U.S.C. § 157(b)(5), which allows the district court "to fix the venue for the trial of personal injury tort and wrongful death claims asserted in non-bankruptcy forums." *Dow Corning*, 86 F.3d at 495-96. Section 157(b)(5) reads:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

The section does not grant jurisdiction. *Stern v. Marshall*, 131 S.Ct. 2594, 2606 (2011). Rather, "[t]he purpose of Section 157(b)(5) is to 'centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case.'" *Dow Corning*, 86 F.3d at 496 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011 ((4th Cir. 1986)) (internal quotation marks omitted); *see also* 1-3 Collier on Bankruptcy ¶ 3.06[3]. There is no indication that Congress intended § 157(b)(5) to be used to alter the substantive law governing the state-law cases transferred under it. Rather, Congress intended § 157(b)(5) to promote efficiency simply by allowing courts to centralize personal injury and wrongful death cases "related to" a bankruptcy. *See A.H. Robins*, 788 F.2d at 1011; *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 829–34 (5th Cir. 1993); *In re Pan Am. Corp.*, 950 F.2d 839, 845 (2d Cir. 1991).

So, although this case looks very much like a diversity case, it is not quite a diversity case—it is a type of "related to" bankruptcy case. The distinction matters only because it raises a narrow question of first impression for this circuit: Should a change of venue under § 157(b)(5) alter which state's law governs or, as in diversity, should a change of venue have no impact on which state law applies?

There is no question that if this were a diversity case whose venue was transferred pursuant to the multidistrict litigation statute, 28 U.S.C. § 1407, or general change-of-venue statute, 28 U.S.C. § 1404, the district court would be bound to apply North Carolina's choice of law rules. In *Van Dusen v. Barrack* and *Ferens v. John Deere Company*, the Supreme Court made clear that normally the appropriate state's choice of law rule attaches when and where the plaintiff files her complaint and then travels with the case. *Ferens v. John Deere Co.*, 494 U.S. 516, 523 (1990) ("[A] transferee forum [must] apply the law of the transferor court, regardless of who initiates the transfer."); *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964); *see also In re Benedectin Litig.*, 857 F.2d 290, 305 (6th Cir. 1988). "[T]he critical identity to be maintained is between the federal district court which decides the case and the courts of the State in which the action was filed." *Van Dusen*, 376 U.S. at 639. Thus, in diversity, "[a] change of venue . . . generally should be, with respect to state law, but a change of courtrooms." *Id.*

Three "independent reasons" support the rule that a change of venue does not change the applicable state law. *Ferens*, 494 U.S. at 523. A change of venue (1) "should not deprive parties of state-law advantages that exist absent diversity jurisdiction," and (2) "should not create or multiply opportunities for forum shopping." *Id.* at 523. If a change of venue meant a change of law, "the transferee forum might have a shorter statute of limitations or might refuse to adjudicate a claim which would have been actionable in the transferor state. In such cases a defendant's motion to transfer could be tantamount to a motion to dismiss." *Van Dusen* 376 U.S. at 629–30. Instead, (3) whether to transfer venue "should turn on considerations of convenience and the interest of justice rather than on the possible prejudice resulting from a change of law." *Ferens*, 494 U.S. at 523.

The principles of practicality and fairness that animate the rule of *Van Dusen* and *Ferens* are equally applicable to personal injury and wrongful death cases originally brought in diversity but transferred via § 157(b)(5) after the defendant filed for bankruptcy. In bankruptcy, just as in diversity, state substantive law defines the parties' underlying rights and obligations. *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *see also Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000). All the rationales for maintaining identity between the state of filing and the federal transfer apply here. Section 157(b)(5)—like sections 1404(a) and 1407—is a venue-transferring provision, and it should not be used to deprive Sutherland of her choice of forum and any "state law advantages" that would exist absent the transfer. *Ferens*, 494 U.S. at 523. Further, because a debtor can choose where to file for bankruptcy under 28 U.S.C. § 1408, applying the law of the state where the bankruptcy court is located would create an opportunity for forum shopping—creating the danger of using § 157(b)(5) as a "forum-shopping instrument." *Van Dusen*, 494 U.S. at 636. And, finally, it is clear that a decision to transfer venue under § 157(b)(5) should, like a venue transfer under § 1404(a), "turn on considerations of convenience and the interest of justice" rather than on an evaluation of "the possible prejudice resulting from a change of law." *Ferens*, 494 U.S. at 523; *see also Dow Corning*, 86 F.3d at 496. If a transfer under § 157(b)(5) would change the substantive law to apply to the transferred case, courts would be justifiably reluctant

to transfer cases, thereby frustrating the section's case-centralizing purpose. *See Dow Corning*, 86 F.3d at 496.[1]

The Second Circuit recently applied the rule of *Van Dusen* and *Ferens* to a similar situation, and that analysis informs our own. In *In re Coudert Brothers LLP*, 673 F.3d 180 (2d Cir. 2012), the court dealt with which choice of law rule to apply to a preexisting tort claim later considered as an adversary proceeding in bankruptcy. The bankruptcy court, which sat in New York, applied New York's choice of law rules. The Second Circuit reversed:

> Extending the well-established rule of *Van Dusen v. Barrack* and *Ferens v. John Deere Co*, we hold that in a case such as this one, where: (1) the claim before the bankruptcy court is wholly derived from another legal claim already pending in a parallel, out-of-state, non-bankruptcy proceeding; and (2) the pending original, or "source," claim was filed in a court prior to the commencement of the bankruptcy case, bankruptcy courts should apply the choice of law rules of the state where the underlying prepetition claim was filed.

*Id.* at 182 (internal citations omitted). The court noted that "it would be fundamentally unfair to allow [the] bankruptcy . . . to deprive [the plaintiff] of the state-law advantages adhering to the exercise of its venue privilege." *Id.* at 190. The plaintiff had filed suit in Connecticut—the case was only in New York because of the defendant's bankruptcy. Under those circumstances, to apply the law of the forum state "would be to allow the defendant . . . to use a device of federal law (the bankruptcy code) to choose the forum and accompanying choice of law—a practice forbidden by [*Van Dusen* and *Ferens*]." *Id.* at 190–91.

*Coudert Brothers* is persuasive, and we apply its reasoning to venue transfers of state law personal injury and wrongful death claims under § 157(b)(5). As the master of her complaint, Sutherland, like the plaintiff in *Coudert*, chose to file suit in North Carolina. *See In re Coudert Bros.*, 673 F.3d at 190; *In re Benedictin Litig.*, 857 F.2d at 305–306. Her case was transferred to Michigan because of Dow Corning's bankruptcy—Sutherland had no choice in the matter.

---

[1]There is a longstanding circuit split on the broader question of whether to apply *Van Dusen*, *Ferens*, and *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941) (from which the rule of *Ferens* and *Van Dusen* originates) to *all* state law disputes arising under the bankruptcy power. *See In re Miller*, 513 F. App'x 566, 572 (6th Cir. 2013). Although we long ago applied *Klaxon* to a choice of law issue arising under a previous version of the Bankruptcy Code, *United Const. Co. v. Milam*, 124 F.2d 670, 671 (6th Cir. 1942), and *Milam* thus supports our decision today, we have not weighed in on the recent circuit split, and we do not address that broad question. We address only the applicability of *Van Dusen* and *Ferens* to the specific and limited category of § 157(b)(5) transfers.

Applying Michigan's choice of law rules would render the involuntary change of venue as "tantamount to a motion to dismiss," *Van Dusen* 376 U.S. at 630, which "would be fundamentally unfair," *Coudert*, 673 F.3d at 190. Sutherland's "change of venue under" § 157(b)(5) "should be, with respect to state law, but a change of courtrooms." *Van Dusen*, 376 U.S. at 639. A venue transfer is not alchemy. North Carolina's choice of law rules governs Sutherland's state law claim because for all intents and purposes her case never left North Carolina.

## IV. REMAND TO APPLY NORTH CAROLINA LAW

North Carolina's choice of law rules are simple: The North Carolina Supreme Court "has made clear that *lex loci delicti* . . . is the appropriate choice of law test to apply to tort claims." *Harco Nat'l Ins. Co. v Grant Thornton LLP*, 698 S.E.2d 719, 722 (N.C. Ct. App. 2010) (italics added). Further, North Carolina applies the statute of limitations "'of the jurisdiction where the suit is brought.'" *Sayer v. Henderson*, 35 S.E.2d 875, 876 (N.C. 1945) (quoting *Vanderbilt v. Atlantic Coast Line R. Co.*, 125 S.E. 387, 393 (N.C. 1924)). Therefore, under North Carolina choice of law rules, that state's laws govern Sutherland's case because her operation occurred in North Carolina. *See Boudreau v. Baughman*, 368 S.E.2d 849, 855–56 (N.C. 1988). North Carolina's statutes of limitations apply because North Carolina is the forum state, *Sayer*, 35 S.E.2d at 876, and remains so regardless of the change of venue, *Van Dusen*, 376 U.S. at 639.

Under N.C. Gen. Stat. § 1-52(16), a plaintiff has three years to file for personal injury after the claim accrues. A claim does not accrue until the harm "becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs." § 1-52(16). North Carolina courts have consistently held, however, that where diseases are concerned, "[t]he only possible point in time from which to measure 'the first injury' in the context of a disease claim is when the disease is diagnosed." *Wilder v. Amatex Corp.*, 336 S.E.2d 66, 72 (N.C. 1985); *see also Dunn v. Pac. Emp'rs Ins. Co.*, 418 S.E.2d 645, 648 (N.C. 1992) (stating that "[d]ecedant's bodily injury claim . . . would have accrued" when his liver cancer was diagnosed "and would have been time-barred three years later under . . . § 1-52(16)"). Thus, "[i]n the case of diseases, the limitations period does not begin until a medical diagnosis reveals the nature of plaintiff's disease." *Earp v. Novartis Pharm. Corp.*, No. 5:11-CV-680-D, 2013 WL 4854488, at

*5 (E.D.N.C. Sept. 11, 2013). The Fourth Circuit has consistently applied this "disease exception," first announced by the North Carolina Supreme Court in *Wilder v. Amatex,* to diseases incurred from exposure to harmful products, including exposures having nothing to do with one's occupation. *See, e.g., Bullard v. Dalkon Shield Claimants Trust*, 74 F.3d 531, 536-37 (4th Cir. 1996) (extending the disease exception to illness caused by an IUD); *Guy v. E.I. DuPont de Nemours & Co.*, 792 F.2d 457, 460 (4th Cir. 1986) (applying disease exception to illness resulting from exposure to diisocynate); *Hyer v. Pittsburg Corning Corp.*, 790 F.2d 30, 33-34 (4th Cir. 1986) (applying disease exception to lung disease caused by exposure to asbestos). Indeed, the dissenting opinion in *Wilder* foresaw that it would potentially have a broad application to "time-delayed product injuries" such as "Dalkon Shield cases" and "microwave cases." *Wilder*, 336 S.E.2d at 74 (Meyer, J., concurring in part and dissenting in part).[2] The *Wilder* disease exception has been applied to both statues of repose and statutes of limitation. *See, e.g., Guy,* 792 F.2d at 460; *Hyer,* 790 F.2d at 34.

Remand is appropriate here, where there is a genuine dispute of material fact regarding when Ms. Sutherland knew that it was her implants that were causing her many symptoms, which emerged over several years and were given several different diagnoses. Sutherland received her implants in June of 1988. According to her deposition testimony, she suffered from a variety of ailments in the five years between the surgery and the lawsuit: vomiting, tinnitus, balance problems, swelling of her uterus and gallbladder, edema, skin rashes, the appearance of painful knots on her body, and chronic pain. Some of Sutherland's symptoms appeared soon after the surgery. "[W]hen I woke up, before I got my eyes open, the first thing that I realized was my ear was ringing really loud before I even got my eyes opened, and then that has never quit," she said. R. 66-3, Page ID 2934. "I threw up the whole evening" after the surgery, Sutherland said. *Id.* at 2935. "It cleared up after a day or two, but in the years that I've been

---

[2]The Seventh Circuit, applying North Carolina law, disagreed with the Fourth Circuit and held that there is no disease exception under § 1-52(16), thus barring a suit concerning a defective hip prosthesis that caused osteolysis. *Klein v. DePuy, Inc.*, 506 F.3d 553, 559 (7th Cir. 2007). However, *Klein* itself appears to be at odds with North Carolina law, as the North Carolina legislature has made it clear that the disease exception continues to apply to its statute of repose for product liability claims. *See* 2009 N.C. Laws S.L. 2009-420 (S.B. 882) (Extending the statute of repose from six to twelve years and stating that "[n]othing in this act is intended to change existing law relating to product liability actions based upon disease."). *See also* 2014 N.C. Sess. Laws 2014-44, § 1 (S.B. 58) (rejecting the Supreme Court's interpretation of N.C. Stat. § 1-52(16) in *CTS Corp. v. Waldburger*, 134 S.Ct. 2175 ((2014)), and affirming an exception to the statute of repose for latent disease claims linked to groundwater contamination). We also note that *Klein* has never been cited by a North Carolina appellate court.

sick, I've done a lot of vomiting." *Id.* She experienced balance problems "[r]ight after the surgery" that lasted "over five [years]." *Id.* at 2938. Some symptoms appeared in the months after surgery. She was hospitalized in September 1988. *Id.* at 2959. Within six months, her hair began to fall out and her skin began to swell. *Id.* at 2944. It was years before other symptoms manifested. "I'd say the rashes started around 1990," Sutherland said. *Id.* at 2942. She experienced "deep bone pain" accompanied by large lumps on her skin "since 1991 almost every day." *Id.* at 2939. And she had a severe systemic reaction when her implants were removed in 1992. *Id.* at 2937.

Although Sutherland's doctors eventually diagnosed her with "silicone-induced autoimmune dysfunction," *id.* at 2946, it is not clear when that diagnosis was first made. "I've had so many problems, you know, they didn't set down and say, this problem is caused by this, that problem's caused by this. They did not do that." *Id*. at 2938. For a period, Sutherland's doctors did not know (or did not share their hypotheses for) what might be causing her symptoms. *See id.* at 2945. Over the years she was apparently diagnosed with lupus, atypical connective tissue disease (which is similar to lupus), and Reynaud's disease. But by 1992 at least one doctor, Dr. Campbell, had determined that silicone could be the culprit and recommended removing the implants. *Id.* at 2947. Sutherland also testified that soon after the surgery she told her family doctor, Dr. Baxter, "I've been sick ever since I had that surgery" and that he told her to see her plastic surgeon. *Id.* at 2943. But Sutherland said she could not remember when a doctor first suggested that the implants could be causing her symptoms. *Id.* at 2943.

The district court concluded that Sutherland realized the implants were making her sick no later than September 1988, when she was hospitalized. The court appears to have based its conclusion on the following exchange:

> A: And then in September of '88, I think I was hospitalized, the month after I got married.
>
> Q: And what caused that hospitalization?
>
> A: I was sick with those implants.

*Id.* at 2959. The district court treated Sutherland's answer as dispositive: "Sutherland admitted that she was hospitalized in September 1988 because the implants were making her sick." R. 79, Page ID 4504. We think that the district court read too much into Sutherland's words. She did not "admit" that she knew in 1988 that the implants were making her sick. Rather, looking back, twenty-three years after she received the implants and eighteen years after filing suit, Sutherland simply stated her present conclusion about the cause of her hospitalization. Sutherland said nothing about her knowledge or state of mind as of September 1988.

Based on this record, there is a genuine question as to when Sutherland first discovered that her symptoms could be linked to her implants. A surgery can cause multiple types of complications for multiple different reasons that may or may not have to do with the implantation of a given device. A reasonable jury could, for example, conclude that the Sutherland did not discover that the silicone was making her sick until 1991 or 1992, when Dr. Campbell recommended removing the implants. The inference is not difficult to draw: It would be implausible that Sutherland would wait very long to have her implants removed after learning that she had silicone-induced autoimmune dysfunction.

## V. CONCLUSION

At this stage, all facts and inferences are viewed in the light most favorable to the plaintiff. A genuine dispute of fact exists as to whether Sutherland's claims are time-barred. We therefore REVERSE the district court's grant of summary judgment for DCC and REMAND the case to the district court for proceedings consistent with this opinion.

———————

## DISSENT

———————

SUTTON, Circuit Judge, dissenting.    At issue is whether Michigan's statute of limitations bars Pamela Sutherland's lawsuit to recover for injuries caused by allegedly defective breast implants.  It does.  Michigan does not have a discovery rule, and as a result its three-year limitations period started running at the time of Sutherland's surgery—June 1, 1988.  *See* Mich. Comp. Laws § 600.5805(13); *Trentadue v. Buckler Lawn Sprinkler*, 738 N.W.2d 664, 672 (Mich. 2007).  That gave her until June 1991 to file suit.  She waited until January 1993 to file the action.  That was too late.

The majority reaches a different conclusion and, it seems to me, makes two mistakes in the process.  One, in claiming that current Michigan law (and its lack of a discovery rule) does not apply, it leaps over the fact that Sutherland did not preserve this argument below and thus forfeited it.  Sutherland devoted one sentence in her summary judgment brief to responding to DCC's choice-of-law argument that current Michigan law applies:  "Not one of these Plaintiffs[] has any connection or nexus to the State of Michigan, yet Defendants try to use Michigan law, primarily."  R. 72 at 6.  That did not "raise" any of the arguments she now makes based on North Carolina and Virginia law and, most particularly, pre-2007 Michigan law (which did contain a discovery rule).  "[C]onclusory allegations and perfunctory statements, unaccompanied by citations or some effort at legal argument, do not meet th[e] standard" for raising an argument. *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).  That is this case.  Any such argument thus is forfeited.  *See Vill. of Maineville, Ohio v. Hamilton Twp. Bd. of Trs.*, 726 F.3d 762, 765 (6th Cir. 2013).  Current Michigan law applies.

Two, the majority reaches an issue we need not decide:  Which choice-of-law rule applies when a district court in one State transfers a diversity suit to a related bankruptcy proceeding in another State?  *See* 28 U.S.C. § 157(b); *In re Coudert Bros. LLP*, 673 F.3d 180, 191 (2d Cir. 2012).  The first imperative of a conflict-of-laws problem is:  a conflict.  When all roads lead to the same result, there is no conflict to resolve.  *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008).

Even if we opt not to apply current Michigan law, Sutherland cannot prevail under any of the other statutes of limitations in play. Start with her arguments under North Carolina and pre-2007 Michigan law. If the law of either State applied, her claims would not accrue until she discovered her injuries. *See Trentadue*, 738 N.W.2d at 672; *Moll v. Abbott Labs.*, 506 N.W.2d 816, 828 (Mich. 1993); N.C. Gen. Stat. § 1-52(16); *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 329 S.E.2d 350, 354 (N.C. 1985) ("[A]s soon as the injury becomes apparent to the claimant or should reasonably become apparent, the cause of action is complete and the limitation period begins to run."). Yet, as the district court found, a reasonable person in Sutherland's position would have linked her ailments to her breast implants by early 1989. Their harmful effects surfaced immediately. She underwent surgery on June 1, 1988. She began vomiting the next day. She suffered balance problems within the first week. And she was hospitalized just three months later in September 1988 because, in her words, she was "sick with those implants." R. 66-3 at 34. By January 1989, Sutherland suffered hair loss and swelling in her legs and ankles. As she acknowledged, "I got sick right after I had those implants put in, and I started going to doctors . . . ." *Id.* at 9. Nothing in her life had changed, though, except the addition of breast implants. Even so, she did not file the lawsuit until 1993. Under the discovery rule, the clock started at the latest in 1989. That makes her January 1993 filing date too late under the three-year window provided by North Carolina law and pre-2007 Michigan law.

As the majority sees things, North Carolina recognizes a "disease exception" that tolls the State's statute of limitations until a doctor informed Sutherland that her problems were implant related. *Ante* at ___ (slip op. at 9). With all due respect, I do not see how that exception applies even if North Carolina law did apply. The exception appears limited to diseases that arise from exposure to a harmful product *at one's jobsite*. *Wilder v. Amatex Corp.*, 336 S.E.2d 66 (N.C. 1985), which established the exception, involved such a disease (asbestosis), and it relied almost entirely on prior cases involving similar diseases. *See id.* at 70–71. Indeed, several cases from North Carolina courts confirm that the exception was designed for "occupational disease cases." *Dunn v. Pac. Emp'rs Ins. Co.*, 418 S.E.2d 645, 647 (N.C. 1992); *see Payne v. Charlotte Heating & Air Conditioning*, 616 S.E.2d 356, 363 (N.C. Ct. App. 2005); *Moore v. Standard Mineral Co.*, 469 S.E.2d 594, 597 (N.C. Ct. App. 1996). Subsequent federal-court cases applying North Carolina law fit that bill too. *See Hyer v. Pittsburgh Corning Corp.*, 790 F.2d 30, 32–33 (4th

Cir. 1986) (former insulator with asbestosis); *Guy v. E.I. DuPont de Nemours & Co.*, 792 F.2d 457, 458 (4th Cir. 1986) (former maintenance worker with disease from floor finish). Sutherland did not contract her illness at work.

The Fourth Circuit, to be sure, has since said that "nothing in *Wilder*" suggests that tolling turns on a disease's "status or lack of status as . . . occupational." *Bullard v. Dalkon Shield Claimants Trust*, 74 F.3d 531, 534 (4th Cir. 1996). That does not seem like the best reading of *Wilder*, but even if it is, that does not help Sutherland. *Wilder* adds that the exception targets diseases that "normally develop over a long period of time after multiple exposures to offending substances" such that "[i]t is impossible to identify any particular exposure as the 'first injury.'" 336 S.E.2d at 70. *Bullard* agrees: "[T]he court looks . . . [to] the difficulty or impossibility of establishing the exact time the injury first occurs or the disease process begins." 74 F.3d at 535. There is no such difficulty here. Sutherland herself admits that her problems were implant related and started the day after her surgery.

What of the Virginia statute of limitations? This limitations period could apply only if some applicable choice-of-law rule said so. None does. Whether we look to Michigan's, North Carolina's, or federal common law's choice-of-law rules, none of them would apply the *Virginia* statute of limitations. North Carolina and federal common law would apply the statute of limitations of the forum: North Carolina or Michigan. *See Bordreau v. Baughman*, 368 S.E.2d 849, 857 (N.C. 1988); *Bickel v. Korean Air Lines Co.*, 83 F.3d 127, 130 (6th Cir. 1996) (noting that the Restatement (Second) of Conflict of Laws (1971) supplies the federal choice-of-law rules); Restatement (Second) § 142(1). And Michigan applies its own statute of limitations in this setting. *See* Mich. Comp. Laws § 600.5861. With Virginia out of reach and Michigan and North Carolina barring her claim, Sutherland's claim fails as a matter of law.

One last note. The majority says that we "'usually defer' to our sister circuits' analysis of the law of states within their respective borders." *Ante* at ___ (slip op. at 4). I am dubious. *Salve Regina College v. Russell*, 499 U.S. 225 (1991), reversed a circuit court for deferring to a district court's determination of its home state's law, telling appellate courts to make these determinations themselves. "When *de novo* review is compelled," the Court instructed, "no form of appellate deference is acceptable." *Id.* at 238. What was true in *Salve Regina* seems

equally true here. It matters not whether the issue is potential deference to a district court's determination of its home state's law (*Salve Regina*) or potential deference to a sister court of appeals' determination of its home state's law (here).

The majority seeing these issues differently, I respectfully dissent.